Adan **LOPEZ–MENDOZA,**
Petitioner-Appellant,

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent-
Appellee.**

Elias **SANDOVAL–SANCHEZ,**
Petitioner-Appellant,

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent-
Appellee.**

Nos. 79–7673, 80–7189.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted En Banc
Dec. 18, 1981.

Decided April 25, 1983.

---

Goodwin, Circuit Judge, filed a specially concurring opinion.

Alarcon, Circuit Judge, filed a dissenting opinion in which Eugene A. Wright, Wallace and Poole, Circuit Judges, joined.

Eugene A. Wright, Circuit Judge, filed an opinion specially concurring in the dissenting opinion.

Poole, Circuit Judge, filed a dissenting opinion.

Mary L. Heen, American Civil Liberties Union, New York City, Douglas P. Haffer, San Francisco, Cal. for Mendoza.

John E. Huerta, Mexican American Legal Defense & Educational Fund, Los Angeles, Cal., for Sanchez.

Karen Morrisette, Washington, D.C., James P. Morris, Atty., Dept. of Justice, Margaret J. Perry, Washington, D.C., for respondent-appellee.

Before BROWNING, Chief Judge, and WRIGHT, GOODWIN, WALLACE, HUG, FLETCHER, ALARCON, POOLE, CANBY, NORRIS, and REINHARDT, Circuit Judges.

NORRIS, Circuit Judge:

These consolidated appeals present the question whether the exclusionary rule bars the Immigration and Naturalization Service (INS) from using in deportation proceedings evidence obtained by INS officers in violation of the Fourth Amendment. In separate proceedings, appellants were ordered deported under 8 U.S.C. § 1251(a)(2) on the basis of admissions to immigration officers that they were aliens in this country illegally. At their deportation hearings, both tried unsuccessfully to suppress evidence of their admissions on the ground they were the products of arrests made in violation of the Fourth Amendment.[1] The immigration judge in Sandoval's case ruled

---

1. At their respective deportation hearings, Sandoval and Lopez each challenged the use of Form I–213 on the ground that it was the product of an illegal arrest. Sandoval's attorney questioned the immigration officer at length about his authority, in the absence of a search warrant, to question the plant workers; about the criteria he used to determine which workers to question regarding their immigration status; and about Sandoval's responses to questions he was asked. All of the attorney's questions were intended to ascertain the legality of Sandoval's arrest. The immigration judge participated in the questioning and in his order noted specifically that "[r]espondent is contending in regard to his denial of deportability that the evidence relied upon by the Government should be suppressed as it is the result of the 'fruit of the poisoned tree.' He stated that his arrest was unlawful, was without a warrant, and he was not advised of his Miranda rights." He went on to rule that the informa-

tion obtained from Sandoval was not tainted by any Fourth Amendment violation because Sandoval's arrest was lawful.

Lopez's counsel also argued vigorously that Lopez had been arrested illegally. Although he styled his request as a motion to terminate the proceedings rather than as a motion to suppress evidence, the only reasonable way to interpret the motion to terminate is as one that includes both a motion to suppress and a motion to dismiss. The only evidence introduced against Lopez was the INS Form I–213 and the affidavit of the immigration officer. Since both were completed based on information obtained as a product of Lopez's arrest, Lopez's argument must be that both must be excluded if his arrest violated the Fourth Amendment. If all the evidence introduced against Lopez must be excluded, there is then no evidence on which he may be deported, and the proceedings must be terminated. This appears to be the way in which the BIA interpreted the motion.

the evidence admissible on the ground that Sandoval's detention did not violate the Fourth Amendment. The immigration judge in Lopez's case held that the exclusionary rule was inapplicable in deportation proceedings, making it unnecessary for him to decide whether Lopez had been unlawfully detained by immigration officers. The appeals of both Sandoval and Lopez from their respective deportation orders were dismissed by the Board of Immigration Appeals. Both appealed directly to this court. We have jurisdiction under 8 U.S.C. § 1105a (1976).

We reverse Sandoval's order of deportation because we hold that his detention by the immigration officers violated the Fourth Amendment, that the statements he made were a product of that unlawful detention, and that the exclusionary rule bars the INS from using, in deportation proceedings, evidence of statements it obtains illegally. Because the question whether Lopez's detention violated the Fourth Amendment was not adjudicated in his deportation hearing, we vacate his order of deportation and remand for further proceedings in light of our opinion today in *Sandoval*.

## I

On June 23, 1977, INS officers entered a potato processing plant in Pasco, Washington, where Sandoval worked, to search for illegal aliens. According to the testimony of the government's only witness, Officer Bower, the officers did not have a search warrant, but did have permission from company officials to question some of the company employees. Bower testified that several officers surrounded the plant to guard the exits while he and another officer conducted the investigation. The two officers, one of whom wore a Border Patrol uniform, first entered the company lunch room and identified themselves. This caused great confusion among company employees, with some "heading for the exits" and others remaining in the lunch room. When the officers entered the plant itself, more employees "headed for the exits, leaving their machines, and some of those com-

ing in turned and started walking away." The officers then moved to the plant's main entrance where they stood during a shift change. There, they watched for workers "putting their heads down, turning their heads to the sides, avoiding eye contact, or trying to get into a tight group of people going through." Anyone passing through the gate who aroused suspicion in the minds of the officers was asked innocuous questions in English about such things as the weather or pay at the plant. Then, Bower testified, "[t]hose that couldn't answer in English, appeared to have a dumb look on their face, didn't know what was going on, and would almost start to move towards me as if they had known they were caught and the game was up, at that point, I would interrogate them in Spanish as to their right to be and remain in the United States."

When examined further about his criteria for stopping and questioning those entering and exiting the plant, Bower repeated that he had looked for "evasive movements, trying to be bunched up in groups, being right next to somebody, or trying to walk in parallel with somebody to avoid being spoken to ...." Eventually, he concluded, he questioned those at the plant "when it [came] to the point where I firmly believe that they are an illegal alien." He knew that point because, "[i]t is something each officer develops, some sooner than some others." After stopping a suspected illegal alien, the investigators would ask him whether he "had papers." Though Sandoval was stopped at the plant, Officer Bower testified that he had no specific recollection of Sandoval and that there was a "50–50 chance" that he had detained Sandoval and an equal chance that his partner had effected the detention. Bower thus did not know how Sandoval had responded to any questions he may have been asked or, indeed, whether he had responded at all.

"Because of the large number of people coming in and out of there," those initially stopped at the plant gate whom the officers wished to question further were detained in a men's restroom and clean-up area. There

is no evidence in the record indicating whether Sandoval was questioned while in the men's room. Eventually, thirty-seven aliens who had been detained in the men's room, including Sandoval, were transported to the Franklin County Jail and processed in the training room of the Pasco Police Department. Once the suspects arrived at the jail, they were sorted into two groups. Those who wished to depart for Mexico voluntarily were processed immediately and placed on a bus leaving that day. Those who demanded a deportation hearing were detained and processed later in the day. Sandoval was one of the latter group. During his processing, Sandoval was not orally advised of his rights but did read and refuse to sign Form I–274, a Spanish-English language form which explains the right to a deportation hearing and to counsel. Sandoval was then asked a series of questions regarding his immigration status. Based on the answers to these questions, Officer Bower completed INS Form I–213, indicating on the form that Sandoval was a native of Mexico and that he had entered the United States without inspection. The finding of alienage by the immigration law judge was based upon the Form I–213.[2]

In rejecting Sandoval's contention that he had been seized in violation of the Fourth Amendment, the immigration judge reasoned that Sandoval "could have at some time . . . reacted in a furtive manner in the presence of the officials" and that "[t]his plus foreign appearance would constitute enough articulable facts [to] give rise to a suspicion of alienage."[3] Accordingly, the judge ruled that Sandoval's detention, first in the men's room of the processing plant and later at the Franklin County Jail, did not violate the Fourth Amendment. On appeal, the BIA held that Sandoval's statements were voluntary and found "no basis

to conclude upon review of the record as a whole . . . that the circumstances of the respondent's arrest affected the statements contained in the Form I–213." The Board did not address the question of the legality of Sandoval's arrest or the applicability of the exclusionary rule to his deportation proceeding.

 On appeal to this court, Sandoval contends that because his statements were the product of an illegal arrest, the INS should be barred from using Form I–213 as evidence in his deportation proceeding. The government first argues that Sandoval's detention at the plant was at most an investigative stop and that the stop was lawful because the "officers' observations were sufficient to support a reasonable suspicion of the illegal nature of petitioner's alienage." Yet Officer Bower could not remember Sandoval or describe his behavior. It is thus difficult to imagine that there was the requisite individualized suspicion of illegal alienage to justify even a brief *Terry* stop of Sandoval. *See International Ladies Garment Workers Union v. Sureck,* 681 F.2d 624, 634–43 (9th Cir.1982). Yet we need not decide that issue, for the dispositive question is not the lawfulness of the initial stop of Sandoval as he entered the plant, but the lawfulness of his detention at the time he was interrogated at the jail. It was there that Sandoval made the statements that were recorded by the INS agents on Form I–213 and used against him at his deportation hearing. By the time of the interrogation at the police station, the initial stop had clearly ripened into an arrest. *See Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979) (when a person is taken to a police station and placed in an interrogation room, the detention, "in contrast to the brief and narrowly circumscribed intrusion involved in [the *Terry* line of] cases . . . [is] in impor-

---

**2.** In deportation proceedings involving unlawful entry into the country, the burden of proof is on the government to prove alienage. Once the government has met its burden, it is then up to the alien to prove his legal status in the United States. *Iran v. INS,* 656 F.2d 469, 471 (9th Cir.1981); 8 U.S.C. § 1361 (West Supp. 1982).

**3.** The immigration judge decided *Sandoval* before we held in *International Ladies Garment Workers Union v. Sureck,* 681 F.2d 624 (9th Cir.1982) that an initial stop must be based on articulable facts giving rise to an individualized suspicion of illegal alienage, not simply alienage alone.

tant respects indistinguishable from a traditional arrest" and must be supported by probable cause). It is clear that there was no probable cause for Sandoval's arrest. The furtive behavior attributed to the arrestees in Officer Bower's testimony— "turning their heads to the sides," "avoiding eye contact," not answering questions asked in English, having "a dumb look"— was patently insufficient as a matter of law to "warrant a man of reasonable caution in the belief," *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that they were aliens illegally in this country. To its credit, the government does not argue to the contrary.

In sum, we must conclude on the record before us that Sandoval was under arrest at the time he was interrogated at the Franklin County Jail, and that because his arrest was not based upon probable cause, it violated the Fourth Amendment.[4] The statements obtained from Sandoval at the police station were thus the fruit of an illegal arrest.[5] The exclusionary rule would, of course, bar the use of such oral statements in a criminal prosecution of Sandoval for violation of the immigration laws. *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). *See also Brown v. Illinois,* 422 U.S. 590, 601–05, 95

S.Ct. 2254, 2260–63, 45 L.Ed.2d 416 (oral statements made following illegal arrest suppressed; giving of *Miranda* warnings prior to statements did not, in itself, purge taint of illegal arrest). We now address the question whether that evidence—specifically, the Form I–213—is admissible in Sandoval's deportation hearing.[6]

**II**

▮ The question of the applicability of the exclusionary rule in deportation proceedings is one of first impression in this Circuit. *See Cuevas-Ortega v. Immigration and Naturalization Service,* 588 F.2d 1274, 1278 (9th Cir.1979) (question expressly reserved); *Hoonsilapa v. Immigration and Naturalization Service,* 586 F.2d 755 (9th Cir.1978) (same). On the one occasion the Supreme Court has had to comment on the question, it stated in dictum that: "[i]t may be assumed that evidence obtained by the [Labor] Department through an illegal search and seizure cannot be the basis of a finding in deportation proceedings." *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 155, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923). Although this language has been read by the First Circuit, *Wong Chung Che v. Immigration and Naturalization Service,* 565 F.2d 166, 169 (1st Cir.1977), and the

---

**4.** For purposes of review, we accept the historical facts as found by the immigration law judge. The question whether, on these facts, Sandoval's arrest was based upon probable cause, however, is one of law which is freely reviewable on appeal. *See United States v. Chesher,* 678 F.2d 1353, 1359 (9th Cir.1982) (court of appeals makes own determination whether agreed facts are sufficient to provide probable cause for issuance of a warrant); *United States v. One Twin Engine Beech Airplane, etc.,* 533 F.2d 1106, 1109 (9th Cir.1976) ("While we will defer to findings of basic facts, especially those depending on the credibility of witnesses and the subtleties of the evidence, we are required to review the determination of probable cause in a forfeiture proceeding as an application of a rule of law"). Since the applicability of the exclusionary rule when a violation of the Fourth Amendment has occurred is also a question of law, no purpose would be served by a remand to the immigration judge for a ruling on this point. *See Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975) (record sufficient to enable reviewing court to determine for itself whether

confession was voluntary; unnecessary to remand for further findings by lower court).

**5.** The government does not contend, and we do not believe, that Sandoval's statements at the police station were so distant from his arrest that they were sufficiently "an act of free will to purge the primary taint" of the illegal arrest. *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Sandoval made the statements within a brief time after his arrest and with no intervening period of freedom. The fact that some form of *Miranda* warnings may have been given Sandoval does not, standing alone, dissipate the taint of his illegal arrest. *Brown v. Illinois,* 422 U.S. 590, 602–03, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

**6.** Unlike criminal prosecutions for violation of the immigration laws, deportation proceedings have historically been classified as civil in nature. *See Woodby v. Immigration and Naturalization Serv.,* 385 U.S. 276, 285, 87 S.Ct. 483, 487–88, 17 L.Ed.2d 362 (1966).

commentators, *see, e.g.,* Comment, *The Exclusionary Rule in Deportation Proceedings,* 14 Davis L.Rev. 955, 957 (1981) (hereinafter cited as *Exclusionary Rule Note*), as approving application of the exclusionary rule, it remains unclear to us whether the Court was expressing a view on the issue or simply assuming *arguendo* that the rule applies in deportation proceedings. We are thus hesitant to attach significant precedential weight to *Bilokumsky.*

The few federal courts which have squarely confronted the question have all held that evidence illegally obtained by federal agents is inadmissible in subsequent deportation proceedings. The first case to so hold was *United States v. Wong Quong Wong,* 94 F. 832 (D.Vt.1899). Relying on *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (evidence obtained in violation of the Fourth Amendment excluded from proceeding imposing forfeiture as penalty for criminal offence), the court in *Wong Quong Wong* reasoned that the "constitutional safeguards [of the Fourth Amendment] would be deprived of a large part of their value if they could be invoked only for preventing the obtaining of such evidence, and not for protection against its use." *United States v. Wong Quong Wong,* 94 F. at 834. Some years later, in *Ex parte Jackson,* 263 F. 110, 112–13 (D.Mont.), *appeal dismissed,* 267 F. 1022 (9th Cir.1920), the district court granted a writ of habeas corpus to an alien held for deportation, stating that "the deportation proceedings [were] unfair and invalid, in that they [were] based on evidence and procedure that violate the search and seizure and due process clauses of the Constitution."

In 1977, the First Circuit held in *Wong Chung Che v. Immigration and Naturalization Service,* 565 F.2d 166 (1st Cir.1977) that evidence obtained in an illegal search by INS agents is inadmissible in a deportation proceeding. Although the court found the issue troublesome, it reasoned that "there is no authority of which we are aware that would make [the evidence] admissible [and] [s]uch authority as we have found ... as-

sumes that it is inadmissible." *Id.* at 169. In making this determination, the First Circuit relied both on *Bilokumsky* and on the leading treatise on immigration law, which stated unequivocally that the rule does apply to deportation proceedings. 1A C. Gordon and H. Rosenfield, *Immigration Law and Procedure* § 5.2.c at 5–31 (rev. ed. 1980) ("[I]t is undisputed ... that the Fourth Amendment prohibition against unreasonable searches and seizures applies in deportation proceedings and that evidence obtained as a result of an unlawful search cannot be used"); *see also* Fragomen, *Procedural Aspects of Illegal Search and Seizure in Deportation Cases,* 14 San Diego L.Rev. 151, 163 (1976) (now well established that exclusionary rule applies despite universal characterization of deportation as civil proceeding). The First Circuit also cited to other cases in which it was assumed that the exclusionary rule applied in deportation proceedings. *See Wong Chung Che v. Immigration and Naturalization Service,* 565 F.2d at 169, citing *Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882, 897–98 (N.D.Ill.1975) (if this were deportation proceeding, rather than exclusion hearing, illegally obtained evidence would be suppressed). *See also Huerta-Cabrera v. Immigration and Naturalization Service,* 466 F.2d 759, 761 n. 5 (7th Cir.1972) (stating that illegal arrest *per se* does not invalidate deportation proceeding but that "[t]his would not be a case of the use of evidence seized during the course of an illegal arrest."); *Yam Sang Kwai v. Immigration and Naturalization Service,* 411 F.2d 683, 690 (D.C.Cir.1969) (Wright, J., dissenting) ("[I]n my view the statement was the fruit of an [illegal] seizure ..., and should not have been admitted"). *But see Hoonsilapa v. Immigration and Naturalization Service,* 586 F.2d 755 (9th Cir.1978) (reserving the question).[7]

Until 1979, in fact, the INS itself had assumed in "countless cases since ... *U.S. ex. rel. Bilokumsky v. Tod,* 263 U.S. 149, 155 [44 S.Ct. 54, 56, 68 L.Ed. 221,]" that the rule was applicable. *Matter of Sandoval,* 17 I &

---

**7.** Several courts have, in addition, considered objections to the use in deportation proceedings of evidence allegedly obtained in violation

of the Fourth Amendment, but have found no violation. *See, e.g., Cordon de Ruano v. INS,* 554 F.2d 944, 945–6 (9th Cir.1977). *See also*

N Dec. 70, 93 (Applemen, Bd. member, dissenting). *See also In re Tsang,* 14 I & N Dec. 1, 2 (BIA 1973) (rule concerning motions to suppress "which is applied in criminal cases, has been adopted for use in deportation hearings"). It was not until 1979, two years after Sandoval's arrest, that the BIA[8] for the first time held, in a case unrelated to this one, that the exclusionary rule does *not* bar the INS from using in deportation hearings evidence obtained by INS agents. *Matter of Sandoval,* 17 I & N Dec. 70, 93 (1979) (BIA 1979). In sanctioning the use of evidence seized by INS agents during an illegal search of an alien's home, the BIA cut against the grain of its own historic practice and the views of every court and commentator to have considered the issue.

In sum, while the question whether the exclusionary rule applies in deportation proceedings is one of first impression in the Ninth Circuit, we do not write on a slate that is entirely clean. With the exception of the BIA, the authorities have uniformly favored exclusion of evidence obtained illegally by INS agents. It is also significant that before the BIA's decision in *Matter of Sandoval,* the INS performed its investigative and prosecutorial functions in a legal regime in which the exclusionary rule was thought to apply. Notwithstanding this prior history, we believe the question merits fresh consideration, especially in light of *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the only case in which the Supreme Court has squarely addressed the applicability of the exclusionary rule to civil proceedings. Because deportation proceedings are deemed to be civil in nature, *Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 285, 87 S.Ct. 483, 487–88, 17 L.Ed.2d 362 (1966), we look to the Court's analysis in *Janis* for guidance in determining whether to apply the rule here.[9]

### III

In *United States v. Janis,* the Supreme Court held that the exclusionary rule did not bar the federal government from using in a civil tax proceeding evidence seized by

---

*Matter of Sandoval, supra,* at 36, (app. to dissent) and Note, *The Exclusionary Rule in Deportation Proceedings: A Time for Alternatives,* 14 J.Int'l Law & Econ., 349, 363 (1980), for lists of cases considering objections to evidence. The fact that these courts found it necessary to decide whether evidence had been seized in violation of the Fourth Amendment may suggest that they assumed the exclusionary rule would apply if a violation were found. Although such cases may not be disregarded as precedent, *see generally Mitchum v. Foster,* 407 U.S. 225, 231, 92 S.Ct. 2151, 2156, 32 L.Ed.2d 705 (1972), we recognize that these courts may simply have chosen to consider the Fourth Amendment issue first and, having found no violation, declined to reach the exclusionary rule issue. *See* the debate in *Tirado v. Commissioner,* 689 F.2d 307 (2d Cir.1982) between Judge Newman, writing for the majority, *id.* at 309 n. 2, and Judge Oakes concurring, *id.* at 315, on the order in which the issues of Fourth Amendment violation and application of the exclusionary rule should be considered.

**8.** After an alien suspected of being in the country illegally is apprehended, he is brought before an immigration law judge who conducts his deportation hearing. 8 U.S.C. § 1252(b). The Board of Immigration Appeals hears appeals from decisions of the immigration law judges. 8 C.F.R. § 3.1(b). The BIA is an agency of the Department of Justice that is separate from the Immigration and Naturalization Service. 8 C.F.R. § 3.1.

**9.** It is, of course, settled law that the exclusionary rule applies in criminal, *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), and quasi-criminal, *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), proceedings.

Although we do not decide the case on this ground, we believe it is arguable that application of the exclusionary rule to deportation proceedings could be justified by characterizing such proceedings as quasi-criminal, applying the rationale of *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). A deportation proceeding closely resembles the quasi-criminal forfeiture proceeding that was the subject of that case. Deportation is a severe sanction in itself (although "deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most severe one—cannot be doubted," *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945)) and is certainly more

state law enforcement officers in violation of the Fourth Amendment. 428 U.S. at 459–60, 96 S.Ct. at 3034–35. In deciding

serious a penalty than that usually imposed in criminal prosecutions for violation of the immigration laws. *Matter of Sandoval,* 17 I & N Dec. at 96 (Applemen, Bd. member, dissenting). Furthermore, deportation is imposed for violation of the same immigration laws on which criminal prosecutions are based. As Board Member Applemen noted in his dissent in *Sandoval,*

> In essence, civil and criminal proceedings walk hand in hand in intrasovereign wedlock ... [t]he government may have a criminal action against an alien for violation of [the immigration laws] ... thrown out because of fatally contaminated evidence, and then turn right around and proceed against him in a deportation proceeding of equal or greater consequence, relying on the identical evidence. This is wrong.... Underlying the majority decision is the premise that there is something inherent in a civil deportation proceeding, as against a criminal proceeding, which makes the application of the rule (a) less necessary, and (b) less effective. Neither of these assumptions is acceptable.

*Id.* at 95–96.

**10.** The Court in *Janis* pointedly refrained from adopting a categorical test making the applicability of the exclusionary rule turn on the characterization of the proceeding as criminal, quasi-criminal or civil. Had it intended to do so, its lengthy analysis of the deterrent effect on state police of excluding evidence from federal civil proceedings would have been a futile exercise. Furthermore, the Court would not have left open the question whether the exclusionary rule is to be applied in civil cases involving intrasovereign violations, cases where the evidence sought to be excluded is seized by agents of the same sovereign attempting to use the tainted evidence in a civil proceeding. *United States v. Janis,* 428 U.S. at 456 n. 31, 96 S.Ct. at 3033 n. 31. Such a test for application of the exclusionary rule bears no relationship to the policy objectives pursued by application of the rule. As Judge Newman pointed out in *Tirado v. Commissioner,* 689 F.2d 307, 313–14 (2d Cir. 1982),

> A test for the exclusionary rule that turns on the civil or criminal character of the proceeding does not comport with an objective of achieving substantial deterrence.... More important, the rule *can* have a deterrent effect in appropriate civil proceedings, as numerous federal courts have recognized.... And if it is not used in such circumstances where it is needed, "the Government would be free to undertake unreasonable searches

*Janis,* the Court employed an analysis that does not foreclose application of the exclusionary rule in all civil proceedings.[10] Rath-

> and seizures in all civil cases without the possibility of unfavorable consequences."
> ... We therefore agree that the exclusionary rule can be properly and beneficially applied in those civil proceedings where it has a realistic prospect of achieving marginal deterrence.

The dissent reads *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) as dictating application of the exclusionary rule depending on the civil or criminal nature of the proceeding. We do not so read *Calandra.* The entire focus of the Court in *Calandra* was on whether exclusion of illegally seized evidence from grand jury proceedings would significantly further the goal of deterrence of police misconduct. The Court concluded that because illegally seized evidence was already excluded from criminal trials, exclusion of such evidence from grand jury proceedings would not provide significant incremental deterrence. As Justice Powell noted for the majority,

> Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal.

*Id.* at 351, 94 S.Ct. at 621. There was simply no suggestion in *Calandra* that the civil or criminal nature of the case had anything to do with whether the exclusionary rule should be applied.

The dissent's suggestion, *see infra* p. 1096, that *NLRB v. South Bay Daily Breeze,* 415 F.2d 360 (9th Cir.1969), *cert. denied,* 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970), dictates application of the rule depending on the civil or criminal character of the case is incorrect. There, we held that the exclusionary rule should not be applied to exclude evidence from an NLRB hearing because the challenged evidence was not seized directly by agents of the government nor with their approval. *Id.* at 363. Our court noted that the rationale for applying the rule did not exist because "[t]here is no logic in excluding evidence to prevent the government from violating an individual's constitutional rights in a case when the government is not guilty of such a violation." 415 F.2d at 364.

We did note in *South Bay Daily Breeze* that even in the absence of Supreme Court deci-

er, while noting that it had never invoked the rule in a purely civil proceeding, 428 U.S. at 447, 96 S.Ct. at 3028–29, the Court adopted an approach that calls for selective application of the rule in civil cases. Consistent with its view that the "prime purpose of the [exclusionary] rule ... is to deter future unlawful police conduct," [11] 428 U.S. at 446, 96 S.Ct. at 3028, quoting *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974), the Court in *Janis* made deterrence the touchstone of its analysis, inquiring whether application of the exclusionary rule in the case before it would produce a "substantial and efficient" deterrent effect. *Id.,* 428 U.S. at 453, 96 S.Ct. at 3031. The analysis was not an empirical one, for there has been little "convincing empirical evidence on the effects of the rule." 428 U.S. at 446, 96 S.Ct. at 3028. Instead, the Court's evaluation of the deterrent effect of invoking the rule was based on "common sense" and on its "own assumptions of human nature and the interrelationship of the various components of the law enforcement system." 428 U.S. at 459, 96 S.Ct. at 3034.

In deciding whether to apply the exclusionary rule in the civil case at issue in *Janis,* the Court balanced the deterrent benefit to be gained against the social cost of invoking the rule. The Court first focused on the likelihood that state police would be deterred from violating the Fourth Amendment if evidence they seized illegally was excluded from federal civil proceedings. The Court reasoned that "the deterrent effect of the exclusion of relevant evidence is highly attenuated when the 'punishment' imposed upon the offending ... officer is the removal of that evidence from a civil suit by ... a different sovereign," *id.* at 458, 96 S.Ct. at 3034. The Court did not believe that application of the exclusionary sanction in such a case would effectively deter state police because the use of evidence in federal civil proceedings is not within their "zone of primary interest." *Id.* The strength of the connection between the purposes of the offending officers and the purposes of those seeking to use the illegal-

---

sions declining to apply the rule when the evidence illegally seized was not taken by the government, we would still decline to apply the rule because "neither criminal proceedings nor sanctions are involved." We did not, however, rest our decision on that point. More important, *South Bay Daily Breeze* was decided before the Supreme Court's decision in *Janis.* To the extent that it suggested a focus on the character of a proceeding in deciding whether to apply the rule, we believe it has been displaced by the *Janis* analysis.

11. Although the Supreme Court has emphasized that the deterrent impact of application of the exclusionary rule is the primary inquiry in deciding whether to invoke it, see *Janis,* 428 U.S. at 446, 96 S.Ct. at 3028, the idea that application of the rule is also demanded by the "imperative of judicial integrity" is tenacious. *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446–47, 4 L.Ed.2d 1669 (1960) (rule applied in federal criminal proceeding despite fact that state officials were responsible for Fourth Amendment violation); *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975) ("application of the exclusionary rule ... protect[s] Fourth Amendment guarantees in two respects: 'in terms of deterring lawless conduct by Federal officers,' and by 'closing the doors of the federal courts to any use of evidence unconstitutionally obtained.' ... These considerations of deterrence and of judicial integrity, by now, have become rather commonplace in the Court's cases" [citing *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)]). *See also United States v. Calandra,* 414 U.S. 338, 357, 94 S.Ct. 613, 624, 38 L.Ed.2d 561 (1974) (Brennan, J., dissenting) ("The exclusionary rule, if not perfect, accomplished the twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the people—all potential victims of unlawful government misconduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government."); *Tirado v. Commissioner,* 689 F.2d at 315–16 (Oakes, J., concurring) ("I disagree that deterrence is the sole rationale of the exclusionary rule.... [Justice Day in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)] stressed personal rights and correlative governmental duties"). While we have no occasion to rule on the question whether this rationale has been entirely supplanted by a deterrence approach, it is worth noting that concern for maintenance of the integrity of the judicial system and the fairness of deportation proceedings, in which the government is already given tremendous discretion and advantage, also tends to support the result we reach here.

ly seized evidence was critical to the Court's assessment of the deterrent value of applying the rule: the closer the connection, the greater the marginal deterrent value of imposing the sanction. Conversely, the deterrent effect of the sanction was believed to be attenuated when the sovereign forbidden from using the evidence is not the same sovereign whose agents illegally obtained it.

As a second step in its analysis, the Court considered the extent to which the persons whose "conduct is to be controlled," *id.* at 448, 96 S.Ct. at 3029, are already subject to the deterrent effects of the rule. In *Janis,* the Court reasoned that because evidence obtained illegally by state police was already inadmissible in both state and federal criminal proceedings, little if any additional deterrence of state police misconduct would be gained by excluding such evidence from federal civil proceedings.

Finally, the Court determined that the attenuated impact of excluding relevant evidence from a federal civil proceeding, coupled with the existing deterrent effect of the rule on state police, created a "situation in which the imposition of the exclusionary rule ... [was] unlikely to provide significant, much less substantial, additional deterrence." *Id.* at 458, 96 S.Ct. at 3034. Accordingly, the Court had no difficulty in concluding, as the third step in its analysis, that the social cost of invoking the rule— hampering enforcement of admittedly valid laws by removing "concededly relevant and reliable evidence," *id.* at 447, 96 S.Ct. at 3029—outweighed its deterrent value in a civil case involving an intersovereign violation. The Court thus held that "the judicially created exclusionary rule should not be extended to forbid the use in the civil proceedings of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign." *Id.* at 459–60, 96 S.Ct. at 3034–35.

## IV

### A

Appellant Sandoval, in arguing that evidence unlawfully obtained by INS agents should be excluded from his deportation hearing, presents us with a question expressly left open in *Janis*—whether the exclusionary rule should be applied in civil cases involving "intrasovereign violations": cases in which "the officer committing the unconstitutional search or seizure[s] [is] an agent of the [same] sovereign that [seeks] to use the evidence." 428 U.S. at 455–56, n. 31, 96 S.Ct. at 3033. In deciding Sandoval's appeal, however, we engage in the same inquiry the Court made in *Janis,* assessing the marginal deterrent benefit of imposing the exclusionary sanction against the INS, and weighing that effect against the social cost of excluding from deportation hearings evidence that is the product of unlawful conduct by INS agents.[12]

---

**12.** Judge Alarcon in dissent relies on a number of cases which are inapposite because of the fundamental distinction between the jurisprudence of the exclusionary rule on the one hand and that of constitutional rights personal to an accused on the other. The Fourth Amendment exclusionary rule, unlike the rules excluding evidence obtained in violation of the Fifth and Sixth Amendments, is not intended to remedy the constitutional violation personally suffered by the party who invokes it; rather, it is a prophylactic rule designed primarily to deter future invasions of the Fourth Amendment privacy interests of all persons, citizens and aliens alike. As the Court noted in *Calandra:*

> The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim:
>
> "[T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late."

*Linkletter v. Walker,* 381 U.S. 618, 637, 85 S.Ct. 1731, 1742, 14 L.Ed.2d 601 (1965).
Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures:

> The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

*Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).

> In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.

414 U.S. at 348–49, 94 S.Ct. at 620.

The first step in the inquiry mandated by *Janis* is an examination of the connection between those who illegally obtained the evidence and those who seek to use it in subsequent proceedings. In this case, the connection could not be more direct: those who violated the Fourth Amendment in obtaining the evidence and those who seek to use it in deportation proceedings are members of the same government agency, the INS. Thus, we are presented not only with an intrasovereign violation, but with an intra*agency* violation as well. The connection between the offending officers and those who seek to use the tainted evidence is further strengthened by an identity of purpose between the two. The immigration officers who interrogated Sandoval after arresting him did so exclusively to aid in filling out INS Form I–213, the form used by INS attorneys at Sandoval's deportation hearing to prove his deportability. When, as here, the offending officer and the prosecutor share a common goal, the deterrent effect of the exclusionary sanction is maximized: an officer will have little incentive to violate the Fourth Amendment if he knows that tainted evidence will be worthless to the prosecutorial agency he serves. *See Tirado v. Commissioner,* 689 F.2d 307, 310–11 (2d Cir.1982).

Taking the second step of the *Janis* analysis, we find that applications of the exclusionary sanction outside the deportation context are not likely to be effective in deterring immigration officers from violating the Fourth Amendment. While it is true that evidence seized illegally could not be used if Sandoval were to be criminally prosecuted for violation of the immigration laws, deportation, not criminal prosecution, is clearly the prime concern of immigration officers. Aliens apprehended for violation of the immigration laws are rarely subjected to criminal prosecution; in the vast majority of cases, they are either allowed to depart voluntarily or are deported following formal proceedings. *See* United States Immigration and Naturalization Service, *1979 Annual Report* 5, 20 (fewer than 2% of the deportable aliens who are apprehended are ever convicted of criminal violations). Thus, criminal prosecution is simply not within the immigration officer's "zone of primary interest." *Janis,* 428 U.S. at 458,

Thus the cases relied on by the dissent, *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); *Harisiades v. Shaughnessy,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); *Helvering v. Mitchell,* 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); *United States ex rel Bilokumsky v. Tod,* 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923); *United States ex rel Turner v. Williams,* 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904); *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *Martin-Mendoza v. Immigration and Naturalization Serv.,* 499 F.2d 918 (9th Cir.1974); *Lavoie v. Immigration and Naturalization Serv.,* 418 F.2d 732 (9th Cir. 1969), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970); and *United States ex rel Circella v. Sahli,* 216 F.2d 33 (7th Cir.1954) are inapposite. As cases dealing with rights under the ex post facto clause and the Fifth, Sixth and Eighth Amendments, they have to do with rights personal to the defendant. In any event, all respondents in deportation proceedings, whatever their status, are protected by the due process clause even though they may not enjoy the full panoply of Fifth and Sixth Amendment safeguards afforded a defendant in a criminal proceeding. *Shaughnessy v. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953)

("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to the traditional standards of fairness encompassed in due process of law.")

As for *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1892), it too has nothing to do with the Fourth Amendment. *Fong Yue Ting* involved a challenge by several Chinese laborers to a federal statute providing that Chinese in the United States could remain only upon proof that they were here in 1882. Such proof had to consist of a certificate issued by the Collector of Internal Revenue or, if such certificate were lost or stolen, of the testimony of at least "one credible white witness." The Court held that the act was constitutional.

Equally telling is the fact that the proceeding in *Fong Yue Ting* had nothing to do with determining whether the Chinese were aliens. Chinese in 1892 could not legally become naturalized citizens of the United States. The defendants in the case were undisputably aliens and the question presented was whether they had met the statutory requirements to remain in the country. The entire purpose of a deportation proceeding, however, is to determine whether someone is an alien and, if so, whether he is in the country illegally.

96 S.Ct. at 3034. Contrary to the BIA's conclusion in *Matter of Sandoval,* 17 I & N Dec. at 78, therefore, we deem it highly unlikely that immigration officers will be deterred from violating the Fourth Amendment by the prospect of unsuccessful criminal prosecutions.[13]

In sum, the *Janis* analysis, when applied here, compels the conclusion that the deterrent impact of invoking the rule in deportation proceedings will be "substantial and efficient."[14] *Janis,* 428 U.S. at 453, 96 S.Ct. at 3032. Not only are the officers seizing the evidence members of the same agency as those seeking to use it, they also share a common goal—the deportation of aliens in the country illegally. Finally, there are no

other applications of the exclusionary rule which effectively deter the offending officers from violating the Fourth Amendment. If the exclusionary rule is the "'strong medicine' its proponents claim it to be," *Janis,* 428 U.S. at 453, 96 S.Ct. at 3032, then we can imagine no more effective application than in these circumstances. Indeed, there is authority that the sanction is "routinely" applied in cases where the deterrent effect of its application is as great as it is here. *See Tirado v. Commissioner,* 689 F.2d at 310, 311 (rule "routinely" applied in "core" cases which "bar use of illegally seized items as affirmative evidence in the trial of the [very same] matter for which the search was conducted").[15] Nonetheless

---

**13.** The BIA reasoned also that even if an alien's *identity* is discovered through an illegal arrest or search, the INS can still establish the alien's deportability with untainted evidence from its files. *See Hoonsilapa v. Immigration and Naturalization Serv.,* 575 F.2d 735, 738 (9th Cir. 1978), *modified,* 586 F.2d 755 (9th Cir.1978) ("We hold that there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence.") Thus, the BIA concluded, as long as INS agents believe they will have access to independent evidence of alienage, they will not be deterred by the prospect of suppression of evidence obtained by illegal conduct. *Matter of Sandoval,* 17 I & N Dec. at 78. That conclusion is unrealistic. It is indeed the law of this circuit, *see Hoonsilapa, supra,* that a person's identity cannot be suppressed, and may thus provide a link to independent evidence in INS files. INS figures suggest, however, that in the large majority of cases the INS has no independent evidence. *See Matter of Sandoval,* 17 I & N Dec. at 85 (Farb, Bd. member, concurring); *see also Wong Chung Che v. Immigration and Naturalization Serv.,* 565 F.2d 166, 168 (1st Cir.1977). To prove alienage in those cases in which it has no independent evidence, the INS must rely on evidence obtained simultaneously with the apprehension. *Id.* Since an INS agent will not know in advance whether the alien to be searched or apprehended is one about whom the INS has existing information, we cannot conclude that this possibility significantly undermines the deterrent value of suppression.

**14.** Because the circumstances here present such a compelling case for application of the exclusionary rule, and because we have here much more than simply an intrasovereign violation, we need not decide the broad question left open in *Janis*—whether the exclusionary

rule applies generally in civil proceedings when intrasovereign violations are involved.

**15.** In *Tirado,* the Second Circuit held the exclusionary rule inapplicable to a civil case involving an intrasovereign violation: use by the IRS in a federal tax proceeding of evidence seized illegally by federal narcotics agents. Despite its holding, however, the court noted that

> courts routinely prohibit governmental authorities from using illegally seized evidence in the proceedings for which the search was conducted, not only in a criminal prosecution, *e.g., Mapp v. Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961), but also in a variety of civil proceedings, *e.g., Wong Chung Che v. INS,* 565 F.2d 166, 168–69 (1st Cir.1977) (documents seized by immigration officials investigating illegal aliens excludable from subsequent deportation hearing); *Knoll Associates v. FTC,* 397 F.2d 530, 534–35 (7th Cir.1968) (documents seized for purposes of FTC investigation excluded from resulting hearing); *Smyth v. Lubbers,* 398 F.Supp. 777, 786 (W.D.Mich.1975) (drugs seized from dormitory rooms by state college officials investigating violations of college rules excluded from resulting disciplinary proceeding); *Iowa v. Union Asphalt & Roadoils, Inc.,* 281 F.Supp. 391, 406–09 (S.D.Iowa 1968), *aff'd sub nom. Standard Oil Co. v. Iowa,* 408 F.2d 1171 (8th Cir.1969) (business records seized by state attorney general excluded from resulting civil antitrust proceeding).

689 F.2d at 311.

We agree, and would add to this list other "core" cases, *id.* at 311, in which the exclusionary rule was applied as a matter of course. *See, e.g., Powell v. Zuckert,* 366 F.2d 634, 639–41 (D.C.Cir.1966), (error to admit goods illegally seized from home of civilian employee by Air Force special investigations officers for use in Air Force proceeding to discharge the employ-

we proceed, under the *Janis* analysis, to assess the social cost of applying the exclusionary rule in deportation proceedings and to balance that cost against the substantial deterrent impact of the sanction on INS misconduct.

### B

The social cost of applying the exclusionary rule in deportation proceedings must be measured primarily in terms of the number of aliens who will succeed in escaping deportation by the suppression of illegally obtained evidence of their alienage or illegal status. When analyzed in these terms, it becomes clear that only an infinitesimal fraction of the illegal alien population will mount challenges based on the exclusionary rule and that the small number who do so successfully will not appreciably increase the number of illegal aliens in our midst.

Historically, the exclusionary rule has been invoked infrequently in deportation proceedings. As it noted in *Matter of Sandoval,* the BIA was able to find only two reported immigration cases since 1899 in which the rule was applied to bar unlawfully seized evidence, only one other case in which the rule's application was specifically addressed, and fewer than fifty BIA proceedings since 1952 in which a Fourth Amendment challenge to the introduction of evidence was even raised. 17 I & N Dec. at 80, 98–99.[16] It is perhaps curious that the rule has been invoked so sparingly in deportation proceedings, especially in view

of the fact that immigration law practitioners have been informed by the major treatise in their field that the exclusionary rule was available to clients facing deportation. *See* 1A C. Gordon and H. Rosenfield, Immigration Law and Procedure § 5.2c at 5–31 (rev. ed. 1980). One plausible explanation is that immigration officers have not committed many Fourth Amendment transgressions because they have been effectively deterred by the exclusionary rule. As noted above, the INS, at least before the BIA's 1979 decision in *Matter of Sandoval,* operated in a legal regime in which the cases and commentators uniformly sanctioned the invocation of the rule in deportation proceedings.

A second plausible explanation for the paucity of challenges based on the exclusionary rule is the relative ease with which aliens who are apprehended may reenter the United States following voluntary departure. Approximately 85% of the aliens present in this country enter from Mexico, from which entry without inspection is not difficult. *See* Department of Justice, *Special Study Group on Illegal Immigrants from Mexico: A Program for Effective and Humane Action on Illegal Mexican Immigration* 6 (1973). Thus those facing deportation to Mexico may find it simpler to leave voluntarily with the thought of reentering the United States at a later time [17] rather than remain to litigate the issue of their deportability.[18]

---

ee); *Rogers v. United States,* 97 F.2d 691 (1st Cir.1938) (liquor illegally seized by federal government officers excluded from use in subsequent civil suit by government to recover Customs duties); *United States v. Blank,* 261 F.Supp. 180, 183–84 (N.D.Ohio 1966) (evidence illegally seized by IRS agents excluded in federal civil tax assessment proceeding); *Lassoff v. Gray,* 207 F.Supp. 843, 846–49 (D.C.Ky.1962) (IRS assessment of excise wagering tax illegally made where IRS had used unconstitutionally seized evidence to establish liability). But *see Morale v. Grigel,* 422 F.Supp. 988, 1000–01 (D.N.H.1976) (evidence illegally seized in student dormitory by school officials admitted in subsequent school disciplinary proceeding).

**16.** The BIA declined to identify which "reported cases" it understood to treat the exclusionary rule issue, although it had previously made

reference to *Ex parte Jackson* and *United States v. Wong Quong Wong, supra.* The point important for our consideration, however, is that it could isolate few cases of any sort in which the exclusion of evidence was discussed, much less accepted.

**17.** INS statistics indicate that the overwhelming majority of those apprehended choose to depart voluntarily: of the approximately one million illegal aliens who are apprehended each year, fewer than 2.5% are deported following formal INS adjudication of their status. *Statistical Yearbook of the Immigration and Naturalization Service* (1979).

**18.** Those who remain to litigate their status and are deported following formal proceedings are also subjected to constraints on any legal

Whatever the explanation, our holding today should result in no significant increase in the frequency with which the exclusionary rule is invoked in deportation proceedings. Hence, in assessing the social cost of holding that the rule bars the INS from using illegally obtained evidence in deportation proceedings, we adopt the realistic premise that the number of aliens likely to escape deportation by invoking the rule is inconsequential. Moreover, whatever number do benefit from application of the rule is insignificant when compared with the flood of illegal immigrants who enter the United States each year. Although statistics on the number of aliens in this country illegally are necessarily unverifiable, available estimates indicate that there are from 2 to 12 million, and it is believed that over 500,000 more enter illegally each year. *See* Los Angeles Times, 1983 at 1, col. 3; Note, *The Exclusionary Rule in Deportation Proceedings: Time for Alternatives,* 14 J.Int'l L. & Econ. 349, 350 (1980) (5 million); Report of the Senate Judiciary Committee, S.Rep. 97–485, on S.2222 at 4 (97th Cong.1982) (citing estimates of the Select Commission on Immigration and Refugee Policy that 3.5 to 6 million illegal aliens were present as of 1978, and noting that "whatever the number four years ago, there are surely many more now"); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975) (12 million). If application of the rule results in aborted deportation proceedings in as many as one hundred cases a year—a number twice as great as the number of evidentiary challenges raised before the BIA since 1952—the result would be an increase of less than one one thousandth of one percent in the illegal alien population. This is hardly an exorbitant price to pay for effective deterrence of INS misconduct. Indeed, the BIA itself has conceded that application of "the rule would not appear to have the potential to significantly impact on this country's immigration laws and policies," *Matter of Sandoval,* 17 I & N Dec. at 80.[19]

Thus the government cannot—and does not—base its argument about anticipated social costs on the numbers of illegal aliens who will succeed in remaining in this country by invoking the exclusionary rule.[20] Rather, the principal concern of the government and the BIA seems to be that by permitting otherwise deportable aliens to remain in the country, the courts will be sanctioning a continuing violation of the immigration laws. Yet neither the BIA's nor the government's assessment of the seriousness of this problem withstands close scrutiny. It strikes us as far-fetched to suggest that sanctioning the continuing "status crime" of illegal alienage is as threatening or damaging to society as is releasing, without punishment, a person known to have violated other provisions of the criminal laws. Illegal aliens are not, as a class, *per se* dangerous to the law-abiding members of the community. In fact just the opposite is true. "Mexican immigrants show no evidence of rejecting fundamental American values and institutions," Cornelius, Chavez & Castro, *Mexican Immigrants and Southern California: A Summary of Current Knowledge* 9 (1982), and common sense tells us that illegal aliens, fearing detection by authorities, have a special incentive to be law-abiding residents of this

reentry they may later try to make. *See* 8 U.S.C. § 1182(a)(16), (17) (aliens who have been deported are "ineligible to receive visas and shall be excluded from admission into the United States").

**19.** We thus reject the contention of the BIA, *Matter of Sandoval,* 17 I & N Dec. at 80, and the dissent, *see infra* p. 1089, that the potential administrative costs of applying the exclusionary rule outweigh its deterrent value. Their drastic predictions of the fiscal and administrative consequences that will result from application of the rule are not defensible in light of past experience. *See infra* p. 1073.

**20.** Indeed, for the government to do so would put it in the awkward position of arguing that violations of the Fourth Amendment by immigration officers are widespread. The government cannot have it both ways. Either violations—and therefore successful challenges—will be few, or they will be extensive, resulting in greater impact of application of the rule but highlighting the need for a strong deterrent.

country. In contrast, the tendency of persons who have once committed crimes to do so again is well documented, *see, e.g., National Council on Crime and Delinquency, Uniform Parole Rep. Characteristics of the Parole Population, 1978* at 3 (1980) (26% of persons committed to prison had served one or more prior prison terms).

We recognize that the problem of illegal immigration is an intractable one. Despite the best efforts of the INS, millions of aliens have managed to enter this country without inspection and to remain here undetected. For various reasons, as Justice White noted seven years ago, "[t]he entire system [of enforcement of the immigration laws] has been notably unsuccessful in deterring or stemming [the] heavy flow of illegal immigrants." *United States v. Ortiz,* 422 U.S. 891, 915, 95 S.Ct. 2585, 2598, 45 L.Ed.2d 623 (1975) (White, J., dissenting). Indeed, it has been estimated that 21,000 officers would be needed to control the 75-mile stretch of border at El Centro, California alone. *Id.* at 900 n. 2, 95 S.Ct. at 2590 (appendix to opinion of Burger, C.J., concurring). We thus appreciate the magnitude of the enforcement task that Congress has assigned the INS. We cannot believe, however, that the difficulty of the task would be perceptibly eased by exempting the INS from the exclusionary sanction.

Were we to give the INS a license to use tainted evidence in deportation proceedings, the agency could no doubt deport some handful of additional aliens who would otherwise escape deportation by invoking the rule. But surely the incremental social cost of harboring those few aliens who do succeed in escaping deportation on this basis and remain in the United States [21] is inconsequential when compared with the marginal deterrence of INS misconduct to be gained by application of the rule. We thus conclude that the marginal deterrent benefit far outweighs the social cost of barring the INS from using in deportation proceedings evidence which its officers seize in violation of the Fourth Amendment.

Before holding that the rule must be applied in deportation proceedings, however, we treat the final contention advanced in *Matter of Sandoval.* Both the BIA in that case and the dissent here suggest that even if the deterrent effect of application of the exclusionary rule in the deportation context is substantial, there are less costly alternatives by which to achieve the rule's goal of deterrence. We disagree. The alternatives proposed simply will not provide the deterrent necessary to ensure that official conduct comports with the Fourth Amendment.

C

The alternatives to the exclusionary rule suggested by the BIA in *Sandoval* are both unrealistic and unacceptable. The BIA reasoned that the offending officer could be sued for damages in a *Bivens*[22] action. *Matter of Sandoval,* 17 I & N Dec. at 82. Yet it is unlikely enough that citizens whose rights have been violated will bring a civil action for damages. It is even harder to imagine that illegal aliens—particularly those who have been deported—will do so. *See generally Exclusionary Rule Note, supra,* at 369–70; Schroeder, *Deterring Fourth Amendment Violations: Alternatives to the Exclusionary Rule* 69 Geo.L.J. 1361, 1393 (1981) ("even damage actions that are pursued with reasonable frequency before an unbiased tribunal and against a financially able government . . . are not an adequate substitute for the exclusionary rule.") Over 97% of the illegal entrants apprehended by the Border Patrol in 1979 were Mexican nationals. United States Immigration and Naturalization Service, *1979 Statistical Yearbook of the Immigration and Naturalization Service,* 80. These indi-

---

**21.** There is, of course, nothing to prevent the INS from later deporting such an illegal alien on evidence not the fruit of a Fourth Amendment violation.

**22.** *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (providing means by which officers who violate Fourth Amendment rights may be sued in their individual capacities).

viduals have a poor command of English, are fearful of authority and are unfamiliar with American culture and values. W. Cornelius, L. Chavez & J. Castro, *supra,* at 57–8. It is hard to believe that they are likely to possess the financial, emotional or cultural wherewithal to pursue a civil damage action against an INS officer when their rights have been violated.

Similarly, prospective injunctive relief, while effective in some circumstances, *see, e.g., International Ladies Garment Workers Union v. Sureck,* 681 F.2d 624 (9th Cir. 1982), is not a satisfactory alternative here. Injunctive relief is generally available only after broad scale violations that result from official policy, and is rarely, if ever, effective to deter violations that result not from official policy but from an individual officer's overzealousness. *See generally Exclusionary Rule Note, supra* at 367–68; Schroeder, *supra,* at 1407–09.

The final alternative, internal discipline, presents a closer question. In theory, self-policing should be the most effective deterrent to illegal conduct because it offers the most direct and immediate feedback to the offending officer. Yet the practical experience of other law enforcement agencies indicates that internal review is rarely effective in deterring Fourth Amendment violations. *See* Schroeder, *supra,* at 1401–07; Note, *The Administration of Complaints by Civilians Against the Police,* 77 Harv.L.Rev. 499 (1964).

Judge Alarcon is apparently convinced that the INS system does not suffer the defects of other self-policing systems. *See, infra,* p. 1092 (Alarcon, J., dissenting). Yet, although his dissent cites at length from the INS disciplinary guidelines, it offers no evidence whatsoever that the guidelines are being consistently and effectively enforced. We agree that the INS has made a commendable effort to design an effective disciplinary system, but "[i]t would ... be myopic to presume from the existence of a remedy its effective and consistent implementation." *Exclusionary Rule Note, supra,* at 371. Even if we could assume adequate enforcement of the INS

guidelines, it would be unrealistic to assume that illegal aliens who have been the victims of unlawful behavior by INS agents will report their experiences to the INS. *See Schroeder, supra,* at 1402.

We are hopeful that the INS' efforts will be an effective complement to the exclusionary rule. Yet we are hesitant to place sole responsibility for ensuring that citizens and aliens alike are free from unwarranted government intrusions into their privacy on the same officers responsible for patroling the borders and apprehending persons they suspect are aliens in this country illegally. As Justice Murphy observed in *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (*overruled by Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)), "[s]elf-scrutiny is a lofty ideal, but its exaltation reaches new heights if we expect a District Attorney to prosecute himself or his associates for well-meaning violations of the search and seizure clause during a raid the District Attorney or his associates have ordered." 338 U.S. at 42, 69 S.Ct. at 1369 (Murphy J., dissenting).

### CONCLUSION

In holding that evidence obtained by the INS in violation of the Fourth Amendment is inadmissible in subsequent deportation proceedings, we do not break new legal ground. Rather, we follow a line of case law directly on point broken only by the BIA's split decision in *Matter of Sandoval.* We also follow a line of cases in which the exclusionary rule has been applied as a matter of routine where those who illegally seized evidence were of the same agency and pursuing the same law enforcement goals as those who sought to use it. Finally, although the Supreme Court has expressly reserved the question whether the rule applies in cases in which those who illegally seized the evidence are agents of the same sovereign who seeks to use it, we believe that its analysis in *Janis* dictates the result we reach in this particular case.

Until 1979, when the BIA decided *Matter of Sandoval,* immigration officers had been making arrests and seizing evidence appar-

ently on the assumption that evidence they obtained in violation of the Fourth Amendment could not be used to prove illegal alienage. 17 I & N Dec. at 93 (Applemen, Bd. member, dissenting). There is no indication that the belief that the exclusionary rule applied significantly impaired the investigative or prosecutorial efforts of the INS. The 200,000 deportation cases successfully prosecuted between 1971 and 1979, the millions of voluntary departures during the same period, and the paucity of cases terminated because of Fourth Amendment violations belie such a notion. We simply cannot believe that our confirmation of the historic view that the exclusionary rule applies in deportation proceedings will seriously impede the INS in the discharge of its statutory duties. Indeed, as aptly put by the dissent in *Matter of Sandoval,* "[t]he rule having been accepted and followed for so many years, the natural inquiry is what reason is there for a change now?" *Matter of Sandoval,* 17 I & N Dec. at 94 (Applemen, Bd. member, dissenting). Whatever the solution to the problem of illegal immigration, we do not think that it lies in judicial compromise of Fourth Amendment values.

If the Fourth Amendment is to retain its vitality as guardian of the privacy of citizens and non-citizens alike, the federal judiciary must be constantly vigilant in ensuring adherence to its commands by those charged with enforcing our laws. We are convinced that the best and indeed the only realistic way to ensure that immigration officers respect the precious values embodied in the Fourth Amendment is to apply the exclusionary rule in deportation proceedings.

For the foregoing reasons, we hold that Sandoval's statements were inadmissible in his deportation hearing and REVERSE his order of deportation. We VACATE Lopez's order of deportation and REMAND his case for further proceedings consistent with this opinion.

GOODWIN, Circuit Judge, specially concurring.

Under the compulsion of *Intern. Ladies' Garment Workers', Etc. v. Sureck,* 681 F.2d 624 (9th Cir.1982), which is the law of this circuit, but with which I disagreed, I concur in the majority opinion. I do not believe that a "Terry Stop" in a work place where the immigration officers have a right to be necessarily ripens into an unlawful seizure on the facts of this case. When, however, the court is satisfied that a Fourth Amendment violation has occurred, then I believe that the exclusionary rule, for better or for worse, applies to deportation hearings as well as to criminal prosecutions.

ALARCON, Circuit Judge, with whom EUGENE A. WRIGHT, WALLACE and POOLE, Circuit Judges, join dissenting:

I respectfully dissent.

Today the majority has extended the exclusionary rule to the suppression of oral statements in *civil* deportation proceedings. None of the cases relied upon by the majority support this radical departure from existing law.

It is equally remarkable that the majority has chosen this drastic example of judicial law making at a time when the United States Supreme Court has raised questions as to whether:

the rule requiring the exclusion at a *criminal* trial of evidence obtained in violation of the Fourth Amendment, *Mapp v. Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961); *Weeks v. United States,* 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652] (1914), should to any extent be modified, so as, for example, not to require the exclusion of evidence obtained in the reasonable belief that the search and seizure at issue was consistent with the Fourth Amendment.

*Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 436, 74 L.Ed.2d 595 (1982) (emphasis added).

In 1886, the United States Supreme Court first applied the exclusionary rule in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Since that date our highest Court has never applied the exclusionary rule in a civil proceeding. The

Court has limited application of the rule to criminal or quasi-criminal proceedings.[1]

Six years after *Boyd,* the Supreme Court noted the clear differences between a criminal trial and a civil deportation proceeding in the following language:

> The order of deportation is not a punishment for crime. It is not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority and through the proper departments, has determined that his continuing to reside here shall depend. He has not, therefore, been deprived of life, liberty or property, without due process of law; *and the provisions of the Constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures, and cruel and unusual punishments, have no application.*
>
> The question whether, and upon what conditions, these aliens shall be permitted to remain within the United States being one to be determined by the political departments of the government, the judicial department cannot properly express an opinion upon the wisdom, the policy or the justice of the measures enacted by Congress in the exercise of the powers confided to it by the Constitution over this subject.

*Fong Yue Ting v. United States,* 149 U.S. 698, 730–31, 13 S.Ct. 1016, 1028–29, 37 L.Ed. 905 (1893) (emphasis added); *accord Li Sing v. United States,* 180 U.S. 486, 495, 21 S.Ct. 449, 453, 45 L.Ed. 634 (1901).

The majority has neither cited nor discussed this clear pronouncement from our highest Court that the provisions of the constitution prohibiting unreasonable searches and seizures have no application to civil deportation proceedings.

We are told that in the last thirty-two years fewer than fifty challenges have been made on fourth amendment grounds, and that "one possible explanation is that immigration officers have not committed many fourth amendment transgressions...." (Maj.Op. at 1069). I agree.

There is no evidence before us of widespread governmental misconduct that must be deterred by granting certain aliens immunity from our immigration laws. Yet, the majority justifies its new rule of evidence in part by pointing out that "the number of aliens likely to escape deportation by invoking the rule is inconsequential." (Maj.Op. at 1070). This mode of analysis is in clear conflict with that taken in *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), wherein the Supreme Court *refused* to extend the exclusionary rule in the face of "the experience of States which deem the incidence of such conduct by the police too slight to call for a

---

1. *See United States v. Janis,* 428 U.S. 433, 447 & n. 17, 96 S.Ct. 3021, 3029 & n. 17, 49 L.Ed.2d 1046 (1976). In *Janis,* the Court noted that it had never applied the rule "to exclude evidence from a civil proceeding, federal or state.[17]" *Id.* at 447, 96 S.Ct. at 3029. In footnote 17, the Court explained that the rule has been applied in civil proceedings involving forfeiture of an article used in violation of the criminal law because "forfeiture is clearly a penalty for the criminal offense...." *Id.* at n. 17, 96 S.Ct. at n. 17 (quoting *Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 701, 85 S.Ct. 1246, 1251, 14 L.Ed.2d 170 (1965)). Although the forfeiture proceeding is deemed civil, it is " 'quasi-criminal' " in nature. *See Janis,* 428 U.S. at 447 n. 17, 96 S.Ct. at 3029 n. 17 (quoting *Boyd v. United States,* 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886)).

In *NLRB v. South Bay Breeze,* 415 F.2d 360, 364 (9th Cir.1969), *cert. denied,* 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970), wherein this court declined to extend the exclusionary rule to labor proceedings, we found it significant that the Court had limited application of the rule to a criminal or quasi-criminal proceedings. Again, in 1978, we stated "that the Supreme Court has never applied the exclusionary rule in a civil proceeding suggests that the rule should not be applied to OSHA proceedings." *Todd Shipyards Corp. v. Secretary of Labor,* 586 F.2d 683, 689 (9th Cir.1978) (citing *United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046 (1976); *NLRB v. South Bay Daily Breeze,* 415 F.2d 360, 364 (9th Cir.1969), *cert. denied,* 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970)).

deterrent remedy not by way of disciplinary measures but by overriding the relevant rules of evidence." *Id.* at 31–32, 69 S.Ct. at 1363–64.

The majority informs us that those courts that have addressed the issue have each held that evidence in civil deportation proceedings obtained in violation of the fourth amendment is not admissible. (Maj.Op. at 1063). The authority relied upon by my prevailing colleagues consists of two district court decisions, which are of dubious precedential value in light of contrary statements in the decisions of higher courts, and a more recent decision of the First Circuit which, when reviewing civil deportation proceedings, would *not* require suppression of *oral* statements obtained after an illegal arrest. *Wong Chung Che,* 565 F.2d 166, 168 (1st Cir.1977).

To justify its extension of the exclusionary rule to civil deportation proceedings, the majority relies most heavily on *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). Yet, in *Janis,* the Supreme Court refused to extend the exclusionary rule to a civil proceeding in spite of the fact that the same evidence had been excluded on search and seizure grounds in a prior state criminal proceeding.

The majority has failed to respect the admonition of the Supreme Court in *Janis* that: "[t]here comes a point at which courts, consistent with their duty to administer the law, cannot continue to create barriers to law enforcement in the pursuit of a supervisory role that is properly the duty of the Executive and Legislative branches." 428 U.S. at 459, 96 S.Ct. at 3034.

### I.

### A.

In its enthusiasm to create an exclusionary rule applicable to civil deportation proceedings, the majority has reversed the order of deportation in the Sandoval-Sanchez matter notwithstanding the fact that Sandoval-Sanchez failed to object to the admissibility of his oral statements on search and seizure grounds. Instead, his counsel sought *termination* of the proceedings on fourth amendment grounds.[2] Lopez also sought termination of the deportation proceedings—not suppression of evidence[3]

---

**2.** Counsel objected to the admission of Form I–213 on grounds of hearsay, lack of jurisdiction, and *Miranda* violations. [SS 37] Subsequently, counsel moved "to suppress I–213 and to terminate the proceedings" because "INS regulations require that the officer who makes the initial arrest is not to be the officer who examines the arrested person for their I–213 purposes but rather some other officer..." [SS 61] He further objected on the grounds that another form, I–214, was not executed and there was no showing that Sandoval-Sanchez knowingly waived his Miranda rights. [SS 62]

Thus, the motion to terminate the proceedings was not even made on fourth amendment search and seizure grounds. In fact, at the close of the hearing, counsel requested that the immigration judge reconsider his motions and counsel stated, in response to the judge's denial, "well, I'm not sure that I have covered all of the grounds that I wish to adduce in support of those motions." [SS 76] The immigration judge indicated that he considered the matter closed. *Id.*

On appeal, counsel renewed objections to Form I–213 on the grounds that " 'no proper foundation was laid' for the admission of the document, and the information reflected on the form 'was obtained involuntarily' " and in violation of his Miranda rights. [SS 16–17]

He also claimed for the first time on appeal that his client's initial detention and arrest deprived him of due process. The arrest also: "was ultra vires the Service's lawful authority and was based upon illegal search and was lacking in probable cause but was invidiously racially discriminatory [sic] and therefore suspect. Respondent was arrested without a warrant although there was no likelihood he would flee. The Judge erred in not granting Respondent's Motion to Terminate proceedings because of lack of jurisdiction based on an invalid Order to Show Cause and illegal procedure violative of the fourth amendment tainting the proceedings. [SS 22]

The record demonstrates, however, that counsel for Sandoval-Sanchez did not base his motion to terminate on the grounds of illegal arrest or seizure. Thus, counsel moved to suppress and to terminate the proceedings, but not on the ground that his arrest and seizure violated the fourth amendment.

**3.** Lopez-Mendoza's fourth amendment contention was "[t]hat the entry of immigration onto the premises ... where respondent was employed, and his subsequent arrest ... was invalid, illegal, and that, therefore, this court has

—apparently under the mistaken notion that proof of a fourth amendment violation somehow deprived the immigration court of jurisdiction. A person charged with a crime who has been the victim of an illegal arrest is *not* entitled to *termination* of the proceedings. *See, e.g., Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865–66, 43 L.Ed.2d 54 (1975); *accord Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 511–12, 96 L.Ed. 541 (1952). Clearly, appellants were not entitled to a termination of these civil deportation proceedings because of alleged fourth amendment violations.

Since neither appellant timely moved to suppress evidence on fourth amendment grounds, the exclusionary rule issue is not properly before us. In a criminal proceeding, the failure to move for the suppression of evidence at trial constitutes a waiver of the right to raise the issue on appeal. *See, e.g.,* Fed.R.Crim.P. 12(b)(3), (f); *see also United States v. Wood,* 550 F.2d 435, 439 (9th Cir.1976).[4] The same rule applies in civil matters. To preserve the issue for appeal, a party must set forth the specific grounds for objecting to the admissibility of evidence. *See, e.g.,* Fed.R.Evid. 403.

We are not told by the majority why it has determined that an alien in a civil deportation proceeding should enjoy the right to raise evidentiary matters for the first time on appeal while a person facing the loss of life, liberty, or property may not do so. The majority has chosen to reach out beyond the record to fashion a new rule in complete derogation of traditional appellate practice and procedure.

B.

We are informed by the majority that it followed the *Janis* test of balancing "the deterrent benefit to be gained against the social cost of invoking the rule." (Maj.Op. at 1067). Notwithstanding this assurance, we are not referred to any facts in this record from which it can be reasonably inferred that immigration officers routinely conduct unreasonable searches and seizures. The record is also barren of any facts that would support an inference that extending the exclusionary rule to civil deportation proceedings would act as a significant deterrent to present INS practices. Instead, the majority, relying on materials outside the record in these proceedings, is forced to speculate as to the reasons why "immigration officers have not committed many fourth amendment transgressions." (Maj.Op. at 1071). Thus, the majority has created a remedy for which there is no demonstrated need.

The majority is also unable to point to any facts in this record from which one can assess the societal costs that will result from the application of the exclusionary rule to civil deportation hearings within the Ninth Circuit. The majority's fancied assumptions about deterrence and societal costs do not comport with the requirement set forth in *United States v. Janis,* 428 U.S. 433, 446–47, 96 S.Ct. 3021, 3028–29, 49 L.Ed.2d 1046 (1976) that we should restrict the application of the rule to those situations that most serve its deterrent purpose.

On appeal to the BIA, Lopez-Mendoza did not argue that this evidence should have been excluded. Rather, he contended that his arrest was illegal and that the exclusionary rule should be expanded so that deportation proceedings may be terminated [L–M 002]. Such expansion, Lopez-Mendoza argued, "would provide an effective remedy to deportable aliens illegally arrested and [would] deter service officers from making illegal arrests. [L–M 002]

no jurisdiction to hear the deportation proceeding at this time." [L–M 101]. The immigration judge denied Lopez-Mendoza's motion to terminate the proceedings based on lack of jurisdiction. [L–M 107] The immigration judge stated that the facts surrounding the arrest were irrelevant because "even if an arrest were improper, it does not affect the issue of deportability, the propriety of deportation proceedings, which is considered civil in nature." [L–M 114]

The record demonstrates that the BIA correctly determined [L–M 002], that Lopez-Mendoza never objected to the admission of form I–213 [L–M 115] or his affidavit. [L–M 116] The immigration judge based his finding of deportation on this evidence.

4. If good cause for delay is demonstrated, the trial court, in its discretion, may consider the motion. *United States v. Woods,* 550 F.2d 435, 439 (9th Cir.1976).

Accord *United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974); *cf. United States v. Vandemark,* 522 F.2d 1019, 1021 (9th Cir.1975) (exclusionary rule ought not to be applied in a vacuum).

The exclusionary rule is a "drastic measure", *Janis,* 428 U.S. at 459, 96 S.Ct. at 3034, and the Supreme Court's decisions caution that drastic remedies should be limited to cases where the record sufficiently demonstrates a need. *See Janis* at 453 & n. 26, 454, 459, 96 S.Ct. at 3034. *Compare Wolf v. Colorado,* 338 U.S. 25, 31–32, 69 S.Ct. 1359, 1362–64, 93 L.Ed. 1782 (1948) (the Court initially refused to extend exclusionary rule to State proceedings because it could not "brush aside the experience of States which deem the incidence of [unlawful] conduct by the police too slight to call for a deterrent remedy not by way of disciplinary measures but by overriding the relevant rules of evidence") and *Irvine v. California,* 347 U.S. 128, 136, 74 S.Ct. 381, 385, 98 L.Ed. 561 (1954) ("There is no reliable evidence known to us that inhabitants of those states which exclude the evidence suffer less from lawless searches and seizures than those of states that admit it") *with Mapp v. Ohio,* 367 U.S. 643, 651–52, 81 S.Ct. 1684, 1689–90, 6 L.Ed.2d 1081 (1961) (the Court extended the rule to state proceedings in part because it determined that state police misconduct was in fact occurring and other remedies were not deterring it). *Cf. Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (the Court was able to evaluate the case on its facts to determine impact of separate but equal education; record demonstrated need for judicial remedy); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (court created rule requiring constitutional admonitions after considering a history of *widespread* coercive police conduct).

### C.

In extending the exclusionary rule to civil deportation cases, the majority has also failed to give adequate consideration to the consequences of this decision on the future status of the alien who gains dismissal of deportation proceedings after a suppression hearing.

The majority has ignored a fundamental distinction between a criminal prosecution and a civil deportation proceeding. When a district court conducting a criminal trial excludes evidence obtained unconstitutionally, it does not thereby immunize the accused from prosecution for *future* criminal activity. An accused can only be prosecuted for specific past criminal activity. No one can be prosecuted solely because he is a person who has chosen to sustain himself by criminal behavior. Criminal sanctions cannot be imposed merely on the basis of the status of the individual. *Robinson v. California,* 370 U.S. 660, 665–68, 82 S.Ct. 1417, 1419–21, 8 L.Ed.2d 758 (1962).

By contrast, being an alien who has entered this country illegally is a status which is a continuing offense under the laws of the United States. A person who wins dismissal of criminal charges because evidence has been suppressed can be arrested and prosecuted if he or she commits a new crime leaving the courthouse. An alien who has entered this country illegally and who thereafter wins dismissal of deportation proceedings under the rule created by the majority is still illegally in this country. Will an alien now be forever immune from deportation, in spite of his or her continuing violation of the immigration laws? Stated differently, does the majority's new rule permit an alien to escape deportation notwithstanding such person's continued and future defiance of our laws under the "fruit of the poisonous tree" concept? *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) has never been so applied in the past in the context of a criminal prosecution. If the majority believes *Wong Sun* is not applicable, then immigration officers will be free to arrest the alien immediately after the suppression motion is granted because the alien is in continuous violation of our immigration laws. If *Wong Sun* applies then such a person is free to remain in this country as long as the alien wishes to do so unless

untainted evidence of illegal status is later discovered. The majority has not addressed these hard questions. A thoughtful analysis of the distinction between a criminal prosecution, which concerns past behavior, and deportation proceedings, which deal with continuing violations of the law, should have compelled the majority to reach a conclusion contrary to that adopted today.

### D.

The majority, citing *United States v. Wong Quong Wong*, 94 F. 832 (D.Vt.1899), *Ex Parte Jackson*, 263 F. 110, 112–13 (D.Mont.), appeal dismissed, 267 F. 1022 (9th Cir.1920), and *Wong Chung Che v. Immigration and Naturalization Service*, 565 F.2d 166 (1st Cir.1977), states that "[t]he few federal courts which have squarely confronted the question have all held that evidence illegally obtained by federal agents is inadmissible in subsequent deportation proceedings." (Maj.Op. at 1064). Before adopting a new rule, based at least in part on precedent from other jurisdictions, we should examine this authority and determine independently if these decisions are well reasoned, consistent with relevant decisions of the United States Supreme Court and applicable to the facts before us. Unfortunately, the majority has failed to provide us a critical analysis of the precedent it invokes.

Our attention is first directed to *United States v. Wong Quong Wong*, 94 F. 832 (D.Vt.1899). In *Wong Quong Wong*, a district judge in 1899 excluded letters seized from the appellant in a civil deportation proceeding. The trial judge, citing *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) and *People v. Sharp*, 107 N.Y. 427, 14 N.E. 319 (1887), held that the seizure of the envelopes was unreasonable and "[could] not be used in evidence . . . without violating the protection afforded by the amendments to all persons in this country." *Wong Quong Wong*, 94 F. at 833. Although the district court judge in *Wong Quong Wong* purported to rely on *Boyd*, he neither analyzed, as did the *Boyd* court, whether the civil proceeding was quasi-

criminal in nature, nor discussed the distinction between civil and criminal proceedings set forth in *Fong Yue Ting*. Had he done so he may have reached a contrary result.

As noted previously, six years prior to the decision reached in *Wong Quong Wong,* the Supreme Court, in *Fong Yue Ting,* discussed the nature of civil deportation proceedings. The Court characterized these proceedings as civil, and not penal or criminal, in nature. The Court concluded that since civil deportation proceedings are not criminal, the fourth amendment's prohibition against unreasonable searches and seizures have no application. 149 U.S. 698, 730–31, 13 S.Ct. 1016, 1028–29, 37 L.Ed. 905 (1893).

In light of this precedent, the *Wong Quong Wong* Court's reliance on *Boyd* is misplaced. *Boyd* involved an action brought by the government to forfeit property for a fraud against the revenue laws. The penalties imposed by the law included monetary fines, imprisonment, and forfeiture of goods. In deciding the applicability of the fourth and fifth amendments to such a proceeding, the Court held that:

> [Because] suits for penalties and forfeitures incurred by the commission of offences against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the fourth amendment of the Constitution and of that portion of the fifth amendment which declares that no person shall be compelled in any criminal case to be a witness against himself. . . .

116 U.S. at 634, 6 S.Ct. at 534. The Court reasoned that a civil forfeiture action, "though technically a civil proceeding, is in substance and effect a criminal one." *Id.* To require production of private papers to prove a violation of the law, and thus the forfeiture of his property, would "[compel one] to be a witness against himself, within the meaning of the Fifth Amendment. . . ." *Id.* at 634–35, 6 S.Ct. at 534–35.

*Fong Yue Ting* clearly states that civil deportation proceedings are not penal or criminal, but rather, civil in nature. Conse-

quently, *Boyd* does not support the decision rendered in *Wong Quong Wong.* In light of the Supreme Court's clear statement in *Fong Yue Ting,* it is quite obvious that *Wong Quong Wong* was wrongly decided— perhaps because the author simply was unaware that the Supreme Court had earlier commented that the fourth amendment's prohibitions against unreasonable searches and seizures have no application to civil deportation proceedings.

*Ex Parte Jackson,* 263 F. 110 (D.Mont.), *appeal dismissed sub nom. Andrews v. Jackson,* 267 F. 1022 (9th Cir.1920), also suffers from this analytical oversight. There, a Montana federal district judge in 1920 granted habeas corpus relief on the ground that the physical evidence used against the petitioner in deportation proceedings, consisting of personal papers and pamphlets, was unlawfully seized. No case authority was cited in support of the trial judge's conclusion that such evidence was inadmissible. No reference was made to *Fong Yue Ting* or to the fact that a deportation proceeding is neither a criminal nor a quasi-criminal proceeding. The district court also failed to consider the deterrent impact, if any, that extension of the exclusionary rule to deportation matters might have, or the costs to society if such a rule were adopted, nor the necessity for such a radical change—considerations now required by the Supreme Court after *Calandra* and *Janis.*

The district judge in *Jackson* appears to have assumed that the law of this circuit entitles an alien in a civil deportation proceeding to the same constitutional protections that are available to an accused in a criminal proceeding. The present law of this circuit is to the contrary. In *Lavoie v. INS,* 418 F.2d 732, 734 (9th Cir.1969), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970), we held that since deportation proceedings are civil and not criminal in nature "the [exclusionary] rules laid down in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) requiring the presence of counsel during interrogation, and other Sixth Amendment safeguards, are not applicable to such proceedings."

Thus, as a result of the majority's decision in the Sandoval-Sanchez matter, an alien in the Ninth Circuit does not have the same fifth and sixth amendment rights of a person facing federal criminal prosecution, but does have the same criminal safeguards available under the fourth amendment. This paradoxical state of the law can only lead to confusion amongst those persons required to follow, enforce, or apply the law as we see it or make it.

The majority also briefly directs our attention to *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 155, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923) wherein the Supreme Court stated: "It may be assumed that evidence obtained by the Department through an illegal search and seizure cannot be made the basis of a finding in deportation proceedings." In *Bilokumsky,* however, the Court concluded that appellant's claim that evidence used against him was obtained by an illegal seizure was unfounded. *Id.* at 155, 44 S.Ct. at 56. Thus, the passage from *Bilokumsky* relied upon by the majority is, at best, dictum. The statement, moreover, appears to have been made for the purposes of disposing of other issues. Indeed, other language in *Bilokumsky* casts doubt as to whether the Court would have invalidated the deportation proceedings had the evidence been seized illegally. The Court, in discussing the admissibility of an alien's statements, made the following observation:

[S]ince deportation proceedings are in their nature civil, the rule excluding involuntary confessions could have no application. *Newhall v. Jenkins,* 2 Gray, 562, 563. Moreover, *a hearing granted does not cease to be fair, merely because rules of evidence and procedure applicable in judicial proceedings have not been strictly followed by the executive; or because some evidence has been improperly rejected or received. Tang Tun v. Edsell,* 223 U.S. 673, 681 [32 S.Ct. 359, 363, 56 L.Ed. 606]. To render a hearing unfair the defect, or the practice complained of, must have been such as might have led to a denial of justice, or there must have

been absent one of the elements deemed essential to due process.

*Id.* at 157, 44 S.Ct. at 57 (footnotes omitted) (emphasis added).

*Bilokumsky* was decided in 1923. Thirty-seven years later in *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) the Supreme Court, with reference to the scope of valid warrantless searches, stated: "According to the uniform decisions of this Court deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions." *Id.* at 237, 80 S.Ct. at 696. No reference was made to the contrary assumption posited in *Bilokumsky.* Whatever meagre precedential value could be found in the assumption made by the Supreme Court in *Bilokumsky* has surely been totally depreciated by the more recent comments of the Court in *Abel* concerning the nonapplicability of certain constitutional safeguards in civil deportation proceedings. *See Abel,* 362 U.S. at 237, 80 S.Ct. at 696.

The only recent case cited by the majority that has expressly held that the exclusionary rule should apply to civil deportation proceedings is *Wong Chung Che v. INS,* 565 F.2d 166 (1st Cir.1977). *Wong Chung Che* in turn relied on the dictum or assumption contained in *Bilokumsky.* 565 F.2d at 169. The decision in *Wong Chung Che* is also not persuasive.

First, as noted above, the assumption. made by the Supreme Court in *Bilokumsky* concerning the admissibility of illegally seized evidence in deportation proceedings is entitled to little weight. Whatever persuasive effect it might have once had has been erased by *Abel.*

Second, the court in *Wong Chung Che* totally ignored recent decisions of the Supreme Court in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) and *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). Thus, the Court in *Wong Chung Che* did not attempt to balance the potential benefits and costs of the rule as applied in the context of civil deportation proceedings as required by *Janis* and *Calandra.* We are bound to follow the decisions of the Supreme Court and free to reject cases from other circuits that fail to do so.

Third, the Court in *Wong Chong Che* failed to discuss, or at least attempt to distinguish, those cases such as *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) and *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), in which the United States Supreme Court appears to limit the application of the exclusionary rule to criminal trials or quasi-criminal proceedings.[5]

Finally, *Wong Chong Che* relies on a statement from an immigration treatise that the exclusionary rule applies in civil deportation proceedings.[6] The cases cited by the treatise do not support this proposition.[7]

In each of the cases relied upon by the majority in support of its extension of the exclusionary rule to civil deportation cases,

---

5. *See also* n. 1 *supra,* and n. 9–10, *infra.*

6. *Wong Chung Che,* 565 F.2d 166, 169 (1st Cir.1977) (citing 1A C. Gordon and H. Rosenfield, *Immigration Law and Procedure* § 5.2.C at 5–31 (1976)).

7. No case cited in support of this principle includes a holding in this regard or resulted in any exclusion of evidence from a deportation proceeding. *See Roa-Rodriquez v. United States,* 410 F.2d 1206 (10th Cir.1969); *Klissas v. INS,* 361 F.2d 529 (D.C.Cir.1966); *United States v. Montez-Hernandez,* 291 F.Supp. 712 (E.D.Cal.1968).

The majority also refers to Fragomen, *Procedural Aspects of Illegal Searches and Seizure in Deportation Cases,* 14 San Diego L.Rev. 151,

163 (1976) (now well established that exclusionary rule applies despite universal characterization of deportation as civil proceedings). Except for the citation to *Wong Chung Che v. INS,* 565 F.2d 166 (1st Cir.1977), the author relies on dicta, *e.g., Bilokumsky v. Tod,* 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923); *Vlissidis v. Anadell,* 262 F.2d 398 (7th Cir.1959) and cases that do not include a holding to this effect, *e.g., Matter of Gonzalez,* 16 I & N Dec. 44 (BIA 1976) (dicta; court noted even if arrest defective, subsequent deportation proceeding would not be unlawful); *Matter of Davila,* 15 I & N Dec. 781 (BIA 1976) (court did not suppress evidence); *Matter of Tsang,* 14 I & N

*papers* had been seized in a warrantless search. No court has extended the exclusionary rule to *oral statements* made following an illegal arrest. *Wong Chung Che* has interpreted *Bilokumsky* as suggesting that it ought *not* be extended to oral statements. 565 F.2d at 168–69.[8]

Thus, it should be noted that the majority erroneously states that the First Circuit held in *Wong Chung Che* "that evidence obtained in an illegal search by INS agents is inadmissible in a deportation proceeding." (Maj.Op. at 1063). In fact, the court held that *physical* evidence so seized would be inadmissible. Oral statements, such as those obtained from Sandoval-Sanchez and Lopez-Mendoza apparently would be *admissible* in the first circuit, contrary to the holding of the majority in the instant matters.

## II.

### A.

I begin my substantive analysis of the wisdom of extending the exclusionary rule

to civil deportation proceedings with the Supreme Court's observation that "[d]espite [the] broad deterrent purpose" of the rule, the Court has never interpreted it "to proscribe the use of illegally seized evidence in all proceedings or against all persons." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). Accordingly, "[i]n the complex and turbulent history of the rule, the [Supreme] Court has never applied it to exclude evidence from a civil proceeding, federal or state." *Janis,* 428 U.S. at 447, 96 S.Ct. at 3029 (footnote omitted).[9]

The exclusionary rule is a "remedial device," and its application "has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Janis,* 428 U.S. at 447, 96 S.Ct. at 3028 (quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)). Consequently, the Court has confined standing to invoke the rule to "situations where the Government seeks to use such evidence to incriminate

Dec. 294 (BIA 1973) (denied motion to suppress because petitioner did not meet burden of proof; court did not address whether exclusionary rule applied); *Matter of Methure,* 13 I & N Dec. 522 (BIA 1970) (arrest valid; therefore court did not address applicability of exclusionary rule); *Matter of Au, Yim & Lam,* 13 I & N Dec. 294 (BIA 1969) (same); *Matter of Chen,* 12 I & N Dec. 603 (BIA 1968) (same). *In the Matter of D- M-,* 6 I & N Dec. 726 (BIA 1955) (motion denied).

8. In *Wong Chung Che,* 565 F.2d at 166, one of the petitioners, Wong Pui Tong, alleged that he had been illegally arrested and searched and that his Crewman's Landing Permit had been seized *from his home without his consent or a search warrant.* Wong Pui Tong sought inter alia "an evidentiary hearing to determine whether either the arrest or the search was illegal and whether evidence taken during either the arrest or search was improperly introduced into [his] ... deportation proceeding." *Id.* at 167. *The court concluded that an illegal arrest does not invalidate a deportation proceeding; however, evidence secured by an illegal search is inadmissible at a deportation proceeding. Id.* at 168–69. In discussing the admissibility of incriminating statements the court in *Wong Chung Che* observed: "While wide latitude is permitted the government in introducing statements of arrested suspects whether or not they might be suppressed in a

criminal proceeding, we can think of no justification by necessity for encouraging illegal searches of premises." *Id. at 169 (footnote omitted).*

9. In a footnote, the Court explained that the exclusionary rule had been applied in civil forfeiture proceedings because they are characterized as quasi-criminal in nature. *United States v. Janis,* 428 U.S. 433, 477 n. 17, 96 S.Ct. 3021, 3029 n. 17, 49 L.Ed.2d 1046 (1978). *See also* note 1 *supra. One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) illustrates the application of the rule to quasi-criminal proceedings. There, the Court relied on *Boyd's* holding that evidence obtained in violation of the fourth amendment may not be utilized to sustain a forfeiture. The Court drew upon the *Boyd* Court's observation that "a forfeiture proceeding is quasi-criminal in character." 380 U.S. at 700, 85 S.Ct. at 1250. The forfeiture proceeding's object, "like a criminal proceeding, is to penalize for the commission of an offense against the law." *Id.* The Court, comparing the similarities between the penalties imposed as a result of both proceedings, concluded that "forfeiture is clearly a penalty for the criminal offense and can result in even greater punishment than the criminal prosecution...." *Id.* at 701, 85 S.Ct. at 1251.

the victim of the unlawful search." *United States v. Calandra,* 414 U.S. at 348, 94 S.Ct. at 620 (citing *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)); *accord Stone v. Powell,* 428 U.S. 465, 488, 96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067 (1976). This standing requirement "is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the government's unlawful conduct would result in imposition of a criminal sanction on the victim of a search." 414 U.S. at 348, 94 S.Ct. at 620.[10]

To determine whether to extend the exclusionary rule to civil deportation proceedings, a balancing approach must be applied.

---

**10.** That the Supreme Court has confined application of the exclusionary rule to situations where the government is seeking to impose a criminal penalty, *e.g., Calandra,* 414 U.S. at 348, 94 S.Ct. at 620, is consistent with the court's historical application of the rule. In *Boyd,* where the rule had its inception, the Court explained the "intimate relation" between the fourth and fifth amendments. 116 U.S. at 633, 6 S.Ct. at 534. In the Court's view, the two amendments "throw great light on each other" because:

> [t]he "unreasonable searches and seizures" condemned in the 'Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man "in a criminal case to be a witness against himself," which is condemned in the Fifth Amendment, throws light on the question as to what is an "unreasonable search and seizure" within the meaning of the Fourth Amendment. And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is different from compelling substantially him to be a witness against himself. We think it is within the clear intent and meaning of those terms.

> \* \* \* \* \* \*

*Id.*

In *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), the Court again construed the fourth and fifth amendments together. Citing *Boyd,* the court answered affirmatively the questions: (1) whether a secret taking of paper violated the fourth amendment; and (2) whether introduction of this paper into evidence against the same person who has been indicted for a crime violates the fifth amendment. To permit the papers seized during an unconstitutional search to be used in evidence, in the Court's view, would compel the defendant to be a witness against himself in a criminal case. *Id.* at 306–07, 41 S.Ct. at 264. *See also Agnello v. United States,* 269 U.S. 20, 33–34, 46 S.Ct. 4, 70 L.Ed. 145 (1925) (it is well settled that when properly invoked, the fifth amendment protects every person from being incriminated by the use of evidence obtained through a search or seizure made in violation of that person's rights under the fourth amendment).

In 1914, the Court held that for the first time "the Fourth Amendment alone may be the basis for excluding from a federal criminal trial evidence seized by a federal officer in violation solely of that Amendment." *Janis,* 428 U.S. at 443, 96 S.Ct. at 3027 (citing *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)). Again, in *Walder v. United States,* 347 U.S. 62, 64–65, 74 S.Ct. 354, 355–56, 98 L.Ed. 503 (1954) the Court, citing *Weeks,* affirmed the notion that the government cannot violate the fourth amendment and use the fruits of such unlawful conduct to secure a conviction.

In 1969, the Court restricted application of the rule, and declined to extend it to one who was not the victim of the unlawful search. The Court stressed that *"[t]he deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment." Alderman v. United States,* 394 U.S. 165, 174–75, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969) (emphasis added).

This principle was reaffirmed in 1974 in *Calandra.* There, the Court explained that standing to invoke the rule had been confined to situations where the government seeks to use evidence to incriminate the victim of the government's unlawful conduct. 414 U.S. at 348, 94 S.Ct. at 620. The Court reasoned that under the exclusionary rule—"adopted to effectuate the Fourth Amendment right of all citizens ... to be secure ... against unreasonable searches and seizures, ... evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." 414 U.S. at 347, 94 S.Ct. at 619 (citations omitted). *See also Stone v. Powell,* 428 U.S. 465, 488, 96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067 (1976) ("[s]tanding to invoke the exclusionary rule has been found to exist only when the Government attempts to use illegally obtained evidence to incriminate the victim of the illegal search.") (citations omitted).

*Calandra,* 414 U.S. at 350, 94 S.Ct. at 621; *accord United States v. Janis,* 428 U.S. 433, 446–47, 96 S.Ct. 3021, 3028–29, 49 L.Ed.2d 1046 (1976). The Supreme Court has explained that the balancing process to be applied "is expressed in the contours of the standing requirement." *Calandra,* 414 U.S. at 348, 94 S.Ct. at 620; *accord Stone v. Powell,* 428 U.S. at 488, 96 S.Ct. at 3049. Thus, the Court has applied the exclusionary rule to proceedings that would result in the possibility of criminal sanctions upon the victim of the illegal search and seizure. *See Calandra,* 414 U.S. at 351, 94 S.Ct. at 621.[11] In such situations, the need for the rule's deterrent value is greater than its attendant social costs.

Our task then is to examine the function and purpose of civil deportation proceedings to determine whether the use of evidence unlawfully seized is likely to result in the imposition of a criminal sanction upon the victim of an illegal search. *See Calandra,* 414 U.S. at 348, 94 S.Ct. at 620. *See also Stone v. Powell,* 428 U.S. 465, 488, 96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067 (1976) (standing to invoke the exclusionary rule has been found to exist only when government attempts to use illegally obtained evidence to incriminate the victim of the illegal search). If so, the need for the deterrent value of the exclusionary rule will be strongest, and concomitantly, the potential deterrent effect of the rule will be substantial. If the civil proceedings will not result in a criminal sanction there will be less necessity for the rule's deterrent effect. Thus, in such

circumstances, it is not likely that that rule's remedial objectives will be most effectively served. Consequently, the social costs of extending the rule, including the impact of the rule on the role and function of the proceeding, will take on far greater significance in the balancing process.

*Calandra* amply illustrates that courts seeking to apply the exclusionary rule in non-criminal contexts must consider the nature of the proceeding in balancing the exclusionary rule's deterrent effect against its cost to society. There, the Court discussed, at length, the role and historic function of the grand jury. 414 U.S. at 343–47, 94 S.Ct. at 617–20. In determining whether to extend the rule to grand jury proceedings, the Court asserted that "we must weigh the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in this context." *Id.* at 349, 94 S.Ct. at 620. The Court emphasized that the grand jury traditionally has been allowed to function unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial because the grand jury does not finally adjudicate guilt or innocence. *Id.* Because adopting the exclusionary rule in this context would disrupt and delay grand jury proceedings, the court declined to extend the rule. *Id.* at 349–50, 94 S.Ct. at 620–21.[12]

In spite of the majority's suggestion to the contrary, (Maj.Op. at 1065 n. 9) *Janis* does not displace an analysis that considers the purpose of the proceedings in attempt-

---

11. In *United States v. Calandra,* 414 U.S. 338, 339, 94 S.Ct. 613, 615, 38 L.Ed.2d 561 (1974), the petitioner had been subpoenaed by a grand jury to answer questions concerning evidence seized during the search of his business at an earlier date. The petitioner moved for suppression and return of the seized evidence on the ground that the search exceeded the scope of the warrant. *Id.* at 340–41, 94 S.Ct. at 616. The district court granted the motion, and the Sixth Circuit affirmed, holding that the exclusionary rule may be invoked by a witness before the grand jury to bar questioning based on evidence obtained in an unlawful search and seizure. *Id.* at 341–42, 94 S.Ct. at 616–17. The Supreme Court reversed, holding that the exclusionary rule is not applicable in grand jury proceedings. *Id.* at 342, 94 S.Ct. at 617.

12. The *Calandra* Court distinguished *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), which involved a petitioner who had successfully sought to exclude evidence before a grand jury proceeding, on the ground that he had previously been indicted and therefore had standing as a criminal defendant to invoke the exclusionary rule. *United States v. Calandra,* 414 U.S. 338, 352 n. 8, 94 S.Ct. 613, 622 n. 8, 38 L.Ed.2d 561 (1974). The *Calandra* Court also noted that in *Silverthorne* there had been an earlier judicial determination that the search and seizure was illegal. *Id.* Consequently, *Silverthorne's* application of the exclusionary rule in the subsequent grand jury proceeding did not disrupt the grand jury function or interfere in its investigative functions. *Id.*

ing to balance the rule's deterrent effect and cost to society. In *Janis,* the question was whether the petitioner, who had successfully suppressed illegally seized evidence in a state criminal trial, should be allowed to have the same evidence suppressed in a subsequent civil federal tax proceeding. The *Janis* Court simply was not asked to determine whether the rule should be extended to all federal civil tax proceedings. The Court, therefore, was not required to consider the nature of civil tax proceedings. The only question in *Janis* was whether any additional deterrent effect could be gained from extending the rule to a subsequent civil federal tax proceeding.

I disagree with the majority's assertion that the *Janis* court "employed an analysis that does not foreclose application of the exclusionary rule in *all* civil proceedings." (Maj.Op. at 1066). (footnote omitted) (emphasis added). The question the Court left open in *Janis* is whether the exclusionary rule should be extended to a subsequent civil proceeding where the officers who conducted an unreasonable search and seizure are the agents of the same sovereign that unsuccessfully sought to use the evidence in a prior criminal proceeding. *See Janis,* 428 U.S. at 455 n. 31, 96 S.Ct. at 3033 n. 31. That issue is not presented by these appeals.

On the other hand, the similarities between the instant case and *Calandra* present helpful analogies in considering the appropriateness of applying the exclusionary rule to civil deportation proceedings.[13] Accordingly, I next examine the historic role and function of civil deportation proceedings.

### B.

Historically, the Supreme Court has long recognized that the responsibility for regulating the relationship between the United States and aliens has been committed to the political branches of the federal government. *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976) (footnote omitted). *See also Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954) ("that the formulation of policies [pertaining to the entry of aliens and their right to remain here are] entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government"); *Turner v. Williams,* 194 U.S. 279, 289–90, 24 S.Ct. 719, 722, 48 L.Ed. 979 (1904) ("Repeated decisions of this Court have determined that Congress has the power . . . to establish regulations for [excluding] such aliens as have entered in violation of law, and to commit the enforcement of such conditions and regulations to executive officers. . . ."); *Nishimura Ekiu v. United States,* 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892) (the constitution confers upon the political department of government the power to exclude and expel aliens).

> This recognition is premised on the view that: [A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference. [citations].

*Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952); *accord Kleindienst v. Mandel,* 408 U.S. 753, 765–67, 92 S.Ct. 2576, 2583–84, 33 L.Ed.2d 683 (1972).

---

**13.** Neither deportation proceedings nor grand jury hearings involve an adversarial determination of guilt or innocence. Further, we are asked by persons who lack the traditional standing of criminal defendants to apply the rule to all proceedings involving civil deportation, just as the Court in *Calandra* was asked to do with respect to grand jury proceedings. Given these similarities, we are bound to consider, in the balancing process mandated by *Calandra,* the "historic function and role" of the civil deportation proceedings. *Accord Stone v. Powell,* 428 U.S. 465, 488, 96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067 (1976) (policies behind exclusionary rule are not absolute but must be evaluated in light of competing policies).

The breadth of this power is reflected in numerous Supreme Court decisions. As we noted in *Adams v. Howerton,* 673 F.2d 1036, 1041–42 (9th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982), the Supreme Court has upheld the broad power of Congress to determine immigration policy in the face of challenges based on the first amendment, *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (statutory exclusion of individuals advocating world communism); the due process clause, *Boutilier v. INS,* 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967) (vague statutory language excluding homosexuals); as well as the equal protection component of the fifth amendment due process clause and constitutionally implied fundamental rights, *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (discrimination based on sex and illegitimacy and denial of fundamental constitutional interest in family relationships).

This court also quoted with approval the principle set forth in *Fiallo v. Bell,* that in the exercise of its broad power over immigration and naturalization, "[C]ongress regularly makes rules that would be unacceptable if applied to citizens." 430 U.S. at 792, 97 S.Ct. at 1478 (quoting *Mathews v. Diaz,* 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976)). *See also Harisiades v. Shaughnessy,* 342 U.S. 580, 586, 72 S.Ct. 512, 517, 96 L.Ed. 586 (1952) (footnote omitted) ("Under our law, the alien in several respects stands on equal footing with citizens, but in others has never been conceded legal parity with the citizen").

The Supreme Court has recently noted that undocumented aliens may be treated differently in terms of their entitlement to state benefits. *See, e.g., Plyler v. Doe,* —— U.S. ——, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982) ("Persuasive arguments support the view that a State may withhold its beneficence from those whose very presence within the United States is the product of their own unlawful conduct"). The Court rejected the notion that undocumented aliens are a suspect class because "[w]ith respect to the actions of the federal government, alienage classifications may be inti-

mately related to the conduct of foreign policy, and to the prerogative power to control access to the United States, and to the plenary Federal power to determine . . . who . . . [may] become a citizen of the Nation." *Id.* at n. 19.

The law is equally well established that deportation, however severe its consequences, is not punishment for a crime, and that deportation proceedings are not penal in nature. *E.g., Mahler v. Eby,* 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924) ("[i]t is well settled that deportation, while it may be burdensome and severe for the alien, is not punishment") (citing *Fong Yue Ting v. United States,* 149 U.S. 698, 730, 13 S.Ct. 1016, 1028, 37 L.Ed. 905 (1893)). Rather, deportation has been characterized by the Court as a regulatory proceeding for the purpose of terminating residence. *Mrvica v. Esperdy,* 376 U.S. 560, 568, 84 S.Ct. 833, 838, 11 L.Ed.2d 911 (1964). *See also Bugajewitz v. Adams,* 228 U.S. 585, 591, 33 S.Ct. 607, 608, 57 L.Ed. 978 (1913) (deportation is "simply a refusal by the government to harbor persons whom it does not want"; it is not punishment; even though the determination by facts might constitute a crime under local law, it is not a conviction of a crime); *Li Sing v. United States,* 180 U.S. 486, 494–95, 21 S.Ct. 449, 452–53, 45 L.Ed. 634 (1901) ("[t]he order of deportation is not punishment for a crime[;] it is not banishment . . . [the alien is not] deprived of life, liberty or property, without due process"). *Cf. Helvering v. Mitchell,* 303 U.S. 391, 399 & n. 2, 58 S.Ct. 630, 633 & n. 2, 82 L.Ed. 917 (1938) (an example of a remedial sanction that is free from the characteristic of "the punitive criminal element" is the deportation of aliens).

This Circuit has also recognized that deportation proceedings are not penal but, rather, regulatory in nature. *See, e.g., Ramirez v. INS,* 550 F.2d 560, 563 (9th Cir. 1977) (deportation hearing is civil, not criminal in nature); *Trias-Hernandez v. INS,* 528 F.2d 366, 368 (9th Cir.1975) (although the consequences of deportation may be severe, the civil nature of the proceeding has been consistently upheld) (citing *United*

States v. Gasca-Kraft, 522 F.2d 149, 152 (9th Cir.1975) and *Chavez-Raya v. INS,* 519 F.2d 397, 400–01 (7th Cir.1975)); *Lavoie v. INS,* 418 F.2d 732, 734 (9th Cir.1969) (the presence of counsel during interrogation and other sixth amendment safeguards are not applicable to deportation proceedings because these cases are civil rather than criminal in nature and the rules for the latter are inapplicable to deportation proceedings), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970).

Thus, because deportation proceedings are not viewed as imposing a criminal sanction, uniform decisions of the Supreme Court hold that "deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions." *Abel v. United States,* 362 U.S. 217, 237, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960).[14] *See also Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954) (*ex post facto* clause has no application to deportation); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952) (in rejecting an *ex post facto* challenge to a provision of the immigration law, the Supreme Court responded that the *ex post facto* provision forbids penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment but that deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal proceeding); *Helvering v. Mitchell,* 303 U.S. 391, 399 & n. 2, 402, 58 S.Ct. 630, 633 & n. 2, 634, 82 L.Ed. 917 (1938) (where a remedial sanction imposed, such as deportation of aliens, the accepted rules and the constitutional guaranties governing the trial of criminal prosecutions do not apply to

the civil proceeding); *Carlson v. Landon,* 342 U.S. 524, 546, 72 S.Ct. 525, 537, 96 L.Ed. 547 (1952) (the eighth amendment does not require bail in deportation proceedings); *Bilokumsky v. Tod,* 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221 (1923) (since deportation proceedings are in their nature civil, the rule excluding involuntary confessions may have no application); *United States ex rel Turner v. Williams,* 194 U.S. 279, 290, 24 S.Ct. 719, 722, 48 L.Ed. 979 (1904) (an alien who is found to be here in violation of the law and deported is not deprived of liberty without due process of law and the provisions of the Constitution securing the right to trial by jury have no application) (citing *Chae Chan Ping v. United States,* 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889)); *Li Sing v. United States,* 180 U.S. 486, 494–95, 21 S.Ct. 449, 452–53, 45 L.Ed. 634 (1901) (deportation is not punishment and provisions of the Constitution securing trial by jury and prohibiting unreasonable searches and seizures have no application).

Our Circuit has followed this view until today. *See, e.g., Martin-Mendoza v. INS,* 499 F.2d 918, 922 (9th Cir.1974) (the sixth amendment's guarantee of the right to counsel is not applicable to deportation proceedings), *cert. denied,* 419 U.S. 1113, 95 S.Ct. 789, 42 L.Ed.2d 810 (1975); *Lavoie v. INS,* 418 F.2d 732, 734 (9th Cir.1969) (deportation proceedings are civil in nature, therefore presence of counsel during interrogation and other sixth amendment rights are inapplicable), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970). Other circuits, too, follow this rule. *Rodriquez-Fernandez v. Wilkinson,* 654 F.2d 1382, 1386

---

**14.** This is not to say that aliens who claim to be citizens are not entitled to notice and an opportunity to be heard to determine their status. To be sure, "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law" *Shaughnessy v. United States,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953). The question then is whether the manner in which Congress has exercised its right to exclude or expel aliens is consistent with the Constitution. *Id.*

Where, however, a civil deportation statute exacts a penalty but does not provide for criminal safeguards, the act is unconstitutional. *See, e.g., Wong Wing v. United States,* 163 U.S. 228, 237, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (if in addition to deportation, aliens are subjected to infamous punishment at hard labor or confiscation of property, then legislation, to be valid, must provide for a jury trial to establish guilt of accused).

(10th Cir.1981) (a deportation proceeding is not penal in nature and normal criminal rights are inapplicable; thus aliens may be arrested by administrative warrant issued without an order of the magistrate and may thereafter be held without bail) (citing *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952)); *United States ex rel. Circella v. Sahli,* 216 F.2d 33 (7th Cir.1954) (deportation proceedings are not criminal, therefore petitioners could not challenge the act on eighth amendment grounds or on grounds that the act complained of constituted an *ex post facto* law).

Were we writing on a clean slate, perhaps we would debate as an original proposition the doctrine that deportation proceedings are not penal in nature, and therefore criminal safeguards are inapplicable, "but [it] [has] been considered [a] closed [subject] for many years and a body of statute [sic] and decisional law has been built upon [it]." *Harisiades v. Shaughnessy,* 342 U.S. at 594, 72 S.Ct. at 521. The majority's ruling contravenes this historical precedent.

### III.

#### A.

As noted earlier, in determining whether to extend the exclusionary rule to a civil proceeding, *Calandra* requires us to weigh the potential injury to the historic role and functions of the proceeding in question against the potential benefits of the rule if applied in this context. *Calandra,* 414 U.S. at 349, 94 S.Ct. at 620. *See also Stone v. Powell,* 428 U.S. 465, 488, 96 S.Ct. 3037, 3049, 49 L.Ed.2d 1067 (1976) (policies behind exclusionary rule are not absolute but must be evaluated in light of competing policies).

In *Calandra,* the Court concluded that the exclusionary rule would seriously impede the grand jury. In declining to extend the rule, the Court reasoned that the grand jury traditionally has been allowed to pursue its investigative and accusatory functions unimpeded by the evidentiary and procedural restrictions applicable to a crimi-

nal trial because the grand jury does not finally adjudicate guilt or innocence. 414 U.S. at 349–50, 94 S.Ct. at 620–21. "Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective." *Id.* at 349, 94 S.Ct. at 621 (footnote omitted). The probable result, in the Court's view, would be a protracted interruption of the proceedings, and, in some cases, the delay might be fatal to the enforcement of the criminal law. As an example, the Court pointed out that two and one-half years had elapsed since the respondent in *Calandra* had been summoned to appear, and noted the possibility that this delay could have completely frustrated the investigation. *Id.* at 349–50 & n. 7, 94 S.Ct. at 621 & n. 7.

After concluding that application of the exclusionary rule would unduly interfere with the effective and expeditious discharge of the grand jury's duties, the Court weighed, as against this potential injury, the possible benefits to be derived from the proposed extension. The Court reasoned that, while in a criminal trial suppression of illegally seized evidence "is thought to be an important method of effectuating the Fourth Amendment, ... it does not follow that the Fourth Amendment requires adoption of every proposal that might deter police misconduct." *Id.* at 350, 94 S.Ct. at 621.

The Court reasoned that any incremental deterrent effect that might be achieved by extending the rule to grand jury proceedings was "uncertain at best." *Id.* at 351, 94 S.Ct. at 621. The Court therefore "decline[d] to embrace a view that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the rae of the grand jury." *Id.* at 351–52, 94 S.Ct. at 622 (footnote omitted).

The analysis employed in *Calandra* compels the same conclusion in the instant case. Civil deportation proceedings do not involve determinations of guilt or innocence of a *criminal* offense. For this reason, the evi-

dentiary and procedural restrictions applicable to criminal trials have not been extended to civil deportation proceedings. Further, suppression hearings could result in protracted interruption of the proceedings, and may seriously impede enforcement of our nation's immigration laws.

While the exact number is uncertain, it has been estimated that there are nearly five million illegal aliens in this country. *See* Note, *The Exclusionary Rule in Deportation Proceedings: A Time For Alternatives,* 14 J.Int'l L. & Econ. 349, 350 (1980). In 1981, immigration officers apprehended 975,780 illegal aliens. U.S. Depart. of Justice, INS Report of Field Operations (1981) (Form G–23.18). The vast majority had their cases disposed of without exercising their right to have their status determined at a formal hearing. Of those arrested, 773,681 voluntarily waived their right to a hearing and were returned to their own country. *Id.* at G–23.8. The balance exercised their right to have their status determined by an immigration judge at a deportation hearing.

The effect of the majority's decision to extend the exclusionary rule to deportation hearings will be to encourage aliens to demand a formal deportation hearing—not to attempt to establish that they are lawfully in the United States—but to challenge the legality of the *officer's* conduct. Currently, approximately forty immigration judges preside over deportation hearings. *See* Levinson, *A Specialized Court for Immigration Hearings and Appeals,* 56 Notre Dame Law, 644, 644 (1981). If each alien is entitled to a suppression hearing, the United States may have to increase the number of immigration judges drastically. Additional funding would then have to be found for hearing rooms and support personnel.

The majority has failed to consider the fact that in federal criminal proceedings, *each* accused person appears before a judicial officer. The federal criminal justice system is constructed so as to give defendants their day in court on any issue they may lawfully wish to raise. There is no procedure by which guilty defendants can be punished without appearing in court. The United States district courts returned 27,367 indictments in 1981. Annual Report of Director of Administrative Office, A–56 (1981). Every accused person who was apprehended in connection with these indictments appeared before a judge. If each defendant chose to make a suppression motion, judicial officers would have been available to consider its merits.

By contrast, immigration judges are not now required to give each alien his or her day in court, if the appearance or determination of status is voluntarily waived. Today's decision creates a strong motivation for aliens now illegally in the United States to challenge the admissibility of evidence at a formal civil deportation proceeding, since aliens can remain in the United States until all legal remedies have been exhausted. The majority's decision thus creates a substantial likelihood that immigration judges will be overwhelmed by hearing requests.

To illustrate the delay this new rule may create on deportation matters, consider the facts in the two matters before this court. Elias Sandoval-Sanchez was arrested June 23, 1977. Adam Lopez-Mendoza was arrested August 1, 1976. If these appeals ultimately prove unsuccessful, Sandoval-Sanchez will have extended his illegal presence in this country by almost six years; Mendoza by almost seven years. In *Calandra,* the Court found that this kind of delay illustrated "the force of the argument" that extension of the exclusionary rule might completely frustrate the objective of the grand jury. 414 U.S. at 349 n. 7, 94 S.Ct. at 621 n. 7.

The majority believes that its holding "should result in no significant increase in the frequency with which the exclusionary rule is invoked in deportation proceedings." (Maj.Op. at 1071). My colleagues then speculate that if the rule results in aborted deportation proceedings in one hundred cases a year, "the result would be an increase of less than one one thousandth of one percent in the illegal alien population." *Id.* This, the majority concludes, would not be an exorbitant price to pay for effective deterrence of INS misconduct.

The majority's modest prognostications, however, misperceive the problem they have created. The majority's estimate of the impact of the exclusionary rule on deportation hearings is based on its assumption that up to 12 million aliens are here illegally. The number of constitutional challenges that will occur under the majority's new rule must be measured, however, against the number of deportable aliens *located.* In 1979, that number was 1,076,-418. The impact of the rule on deportation proceedings is not so much that the illegal alien population will increase—indeed it does so every year despite heightened enforcement policies. Rather, the impact of the rule on civil deportation proceedings must be measured against the number of motions to suppress that will be made—not the number of constitutional challenges that are meritorious. This is the potential injury to the deportation proceeding that must be weighed in the balancing process.

Moreover, it is an integral function of our federal district courts to resolve constitutional questions. In marked contrast, the responsibility of immigration judges in deportation proceedings has been to resolve factual questions concerning the status of an alien, not to resolve constitutional issues. Given the unsuitability of the immigration hearing to the resolution of complex constitutional controversies, the adverse impact that today's decision may have on the civil deportation proceedings cannot be ignored.

In this regard, the BIA's damage assessment should be compelling, as that court, more so than this one, is in a position to anticipate the cost to the system in which it functions. In my view, we should defer to the following judgment:

> Absent the applicability of the exclusionary rule, questions relating to deportability routinely involve simple factual allegations and matters of proof. When Fourth Amendment issues are raised at deportation hearings, the result is a diversion of attention from the main issues which those proceedings were created to resolve, both in terms of the expertise of the administrative decision makers and of the structure of the forum to accommodate inquiries into search and seizure questions. The result frequently seems to be a long, confused record in which the issues are not clearly defined and in which there is voluminous testimony, but the underlying facts [are] not sufficiently developed. The ensuing delays and inordinate amount of time spent on such cases at all levels has an adverse impact on the effective administration of the immigration laws, which to date (in view of the virtual absence of cases in which evidence has been ultimately excluded) has in no way been counterbalanced by any apparent productive result.

*Matter of Sandoval,* 17 I & N Dec. 70, 80 (BIA 1979) (footnote omitted).

Although the majority apparently rejects this conclusion, it offers no principled reason for its action other than the observation that it "is not defensible in light of past experience." (Maj.Op. at 1072 n. 19). Presumably, this past experience consists of its estimate that there have been approximately some fifty challenges on fourth amendment grounds since 1952. Certainly, the number of aliens and the number of deportation proceedings have dramatically increased each year since 1952. *See* 1979 Annual Report of the Immigration and Naturalization Service at 3 (more deportable aliens were apprehended in fiscal year 1979 than in any other fiscal year since 1954); *see also A. Program for Effective and Humane Action on Illegal Immigrants* (Jan. 15, 1973) at 6 (in fiscal year 1960, fewer than 30,000 aliens were apprehended, in 1965, the number nearly doubled; in the following five year period, the apprehension figure experienced a 400 percent jump, rising to nearly 280,000 in fiscal year 1970). Given these increases, past experience is not an accurate indicator of the potential injury the exclusionary rule would have on today's deportation proceedings.

At least one study supports this concern. *E.g., A Program Annual Report of the Immigration and Naturalization Service for Effective and Humane Action on Illegal Immigrants* (January 15, 1973) at 16.

There, it is stated that "The Immigration Service's costs for detaining deportable aliens have risen by 74 percent in the past two years, and any policy change which would result in longer periods of detention for greater numbers of aliens could be a serious burden on the Service's resources." *Id.* (footnote omitted) (citing Hearings on Illegal Aliens Before the Subcomm. of the House Comm. on the Judiciary, 92d Cong., 2nd Sess., pt. 5, 1335 (1972)). The majority has not considered the enormous and immediate fiscal impact that its decision may have nor the chaos that may be visited upon our immigration courts. For example, if we were to use 1981 statistics, immigration courts' case loads could rise by over 700,000 matters. The majority has not suggested how this nation in the midst of a recession and faced with a staggering federal budget deficit, will pay the costs of implementing this court's tinkering with the rules of evidence in deportation proceedings.

### B.

As noted earlier, *Calandra* instructs us that the need for the exclusionary rule's deterrent effect is strongest in situations where the government's unlawful conduct will result in the imposition of a criminal penalty upon the victim of the unlawful conduct. 414 U.S. at 348, 94 S.Ct. at 620. Civil deportation proceedings do not result in the imposition of a criminal sanction, and the government does not seek to use the illegally seized evidence to incriminate the victim of an unreasonable search. Consequently, the need for the exclusionary rule remedy is not strongest in civil deportation proceedings. Indeed, the majority concedes that a plausible explanation for the "paucity" of challenges to the legality of searches in deportation proceedings is that immigration officers commit few unreasonable searches. (Maj.Op. at 1071).

Another explanation is that the Immigration and Naturalization Service has instituted a comprehensive procedure for the investigation and prosecution of disciplinary actions against immigration officers who are accused of conducting an illegal search and seizure. An immigration officer who is found to have conducted an unconstitutional search is subject to various penalties and disabilities including "removal from his job[,] which may bar him from future federal employment." U.S. Department of Justice, Immigration and Naturalization Service, The Law of Search and Seizure for Immigration Officers, 35 (1979) (footnote omitted). Each employee of the INS is required to report any allegation of a violation by an immigration officer of an alien's constitutional rights. *See* Immigration and Naturalization Service Operations Instructions, 287.10, 4721, 4723.

An employee who fails to report any allegation of a unreasonable search and seizure by an immigration officer is subject to disciplinary action. *See id.* at 4730. The employee is required to report such allegations to his supervisor, district director, chief, patrol agent or officer in charge. *Id.* Deportation proceedings must be suspended upon the filing of such an allegation against an immigration officer. "Whenever an allegation is made by, on behalf of, or involves an alien, no action will be taken to enforce the departure from the United States of either the alien or of any witnesses involved until a preliminary inquiry or an investigation of the matter has been completed." *Id.* at 4730. Depending on the category of the alleged misconduct and the job level of the accused individual a report is then made to the Office of Professional Responsibility or to the Regional Commissioners (or their designee). *Id.* at 4728.

These disciplinary procedures come under the Service Professional Responsibility Program. This program is headed by the Office of Professional Responsibility, which plans, directs and manages "the Service's investigative program concerning allegations or information of criminal, or other misconduct by Service employees." *Id.* at 4721. The program requires that the Office of Professional Responsibility or the regional office immediately upon receiving the report determine "whether or not the alleged offense is prima facie misconduct and whether or not a Service employee is or

may be involved." *Id.* at 4731. If it is determined that the allegation did involve misconduct by an INS employee then a preliminary inquiry is to be conducted. *Id.* at 4732. The preliminary hearing is directed by an employee selected by the Director of the Office of Professional Responsibility or a regional commissioner. *Id.* at 4733. "The employee selected to conduct the preliminary inquiry if not a supervisory employee must not be from the same district or sector as the involved employee. Supervisory employees shall not be from the same operating branch as the accused employee." *Id.* The inquiry must be completed and a memorandum report submitted to the Director of the Office of Professional Responsibility or the regional commissioner within ten working days from the date assigned. *Id.* at 4733–34. If the preliminary inquiry supports the allegation of misconduct an investigative hearing is then commenced. *Id.* at 4735–36.

Depending on the degree of the offense or the job level of the accused the investigation will be conducted by a staff officer from the Office of Professional Responsibility or an officer selected by the Regional Commissioners or their designees. *Id.* at 4735–36. The officer selected by the Regional Commissioners, "if not a supervisory employee, must not be from the same District or Sector as the involved employee. Supervisory employees selected shall not be from the same operating branch as the accused employee." *Id.* at 4736. These investigations must be completed and reports submitted within sixty days of the date the case is assigned. *Id.* at 4737. An extension of time to complete an investigation is only granted for a compelling reason. *Id.* at 4737–38. All investigative reports are reviewed for "sufficiency of the investigation and approved by the Director ... [of the Office of Professional Responsibility] or by Regional Commissioners. ... *Id.* at 4738. If the allegations are sustained then depending on the seriousness of the offense, the matter may be forwarded to the U.S. Attorney having jurisdiction over the matter or "to the Associate Commissioner, Management, or the Associate Regional Commissioner, Management to assure appropriate corrective action as warranted by designated officials." *Id.* at 4739.

It is readily apparent from reviewing the Immigration and Naturalization Service's disciplinary procedure that a sincere effort is being made to deter and to punish search and seizure violations. A police officer who conducts an unreasonable search and seizure may suffer anguish when a criminal defendant goes free because of his blunder. He does not, however, face the immediate prospect of unemployment as a result of the exclusion of illegally seized evidence. An immigration officer on the other hand, faces loss of his job and denial of future federal employment if he conducts an illegal search and seizure. These stern consequences should serve as a far greater deterrent to improper conduct than the possibility that deportation proceedings against an alien may be dismissed. No evidence has been cited to this court that these harsh disciplinary measures proved ineffective.

To paraphrase the Supreme Court's cogent statement in *United States v. Caceres,* 440 U.S. 741, 755–57, 99 S.Ct. 1465, 1473–74, 59 L.Ed.2d 733 (1979), where the Court refused to apply exclusionary rule to evidence obtained in violation of an Internal Revenue Service regulation, we should not "ignore the possibility that a rigid application of the exclusionary rule ... could have a serious deterrent impact on the formulation of additional standards to govern ... procedures." (footnote omitted). Just as in *Caceres,* "the Executive itself has provided for internal sanctions." *Id.* at 756, 99 S.Ct. at 1473. To go beyond that, and require the application of the exclusionary rule in deportation proceedings, "would take away from the Executive department the primary responsibility for fashioning the appropriate remedy ..." to curb unreasonable conduct on the part of its officers. *Id.*

Conceding that self policing should be the most effective deterrent because it offers direct and immediate feedback to the officer, the majority nevertheless concludes that the INS regulations will not be an effective deterrent. (Maj.Op. at 1071).

Again, the majority cannot, in the face of a silent record, point to any evidence that INS officers are not obeying the internal regulations which condemn and punish unreasonable searches and seizures. To mask this lack of factual support for its premise, our attention is diverted to the claims of certain legal writers that "the practical experience of other law enforcement agencies indicates that internal review is rarely effective in deterring fourth amendment violations." (Maj.Op. at 1074). In the absence of evidence to the contrary, we are required to presume that immigration officers have lawfully performed their duties. *See FCC v. Schreiber,* 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) (administrative agencies are entitled to a presumption that they act properly and according to law); *In re Hergenroeder,* 555 F.2d 686 (9th Cir. 1977) (the government is presumed to obey the law). The majority, without citation to any authority, apparently would reverse this ancient presumption, in the absence of affirmative evidence "that the guidelines are being consistently and effectively enforced." (Maj.Op. at 1071). I can find no justification in the record—nor in the majority's opinion—for its refusal to apply the rules concerning the legal effect of presumptions to aliens who have entered this country illegally.

As noted previously, the majority has failed to identify any facts which demonstrate that the exclusionary rule is necessary in civil deportation proceedings or that it will serve as a deterrent to INS officers in conducting arrests, searches, and seizures. Rather, the majority relies solely on the assumption made in the criminal context that the exclusionary rule effectively deters police from violating a defendant's fourth amendment rights. While the Supreme Court continues to apply this assumption in criminal cases, it does not follow that it will do so in non-criminal matters. Indeed, the *Janis* court *refused* to apply the assumption to justify extending the rule to a tax proceeding. The extension of the rule to a federal civil tax proceeding would have been "an unjustifiably drastic action by the courts in the pursuit of what

is an undesired and undesirable supervisory role over police officers." 428 U.S. at 458, 96 S.Ct. at 3034 (citing *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (footnote omitted). The Court further stated that:

> In the past this Court has opted for exclusion in the anticipation that law enforcement officers would be deterred from violating Fourth Amendment rights. Then, as now, the Court acted in the absence of convincing empirical evidence and relied, instead, on its own assumptions of human nature and the interrelationship of the various components of the law enforcement system. In the situation before us, we do not find sufficient justification for the drastic measure of an exclusionary rule.

*Id.,* 428 U.S. at 459, 96 S.Ct. at 3034.

In my view, *Janis'* message is simply this: those seeking the extension of the rule must demonstrate that there is sufficient justification for the "drastic measure" of the exclusionary rule. *See id.* at 453 n. 26, 96 S.Ct. at 3031 n. 26 ("we do not mean to imply that more accurate studies could never be developed, or .... provide us with firmer conclusions. We just do not find that the studies now available provide us with reliable conclusions"). It seems clear to me that since *Janis* the Supreme Court will no longer rely on human assumptions as the basis for applying the exclusionary rule to civil proceedings.

Unlike the field of criminal law, the supervisory role over deportation is committed to the political branches of our government. The power of Congress over the admission of aliens and their right to remain "is necessarily very broad, touching as it does basic aspects of national sovereignty, more particularly our foreign relations and the national security." *Galvan v. Press,* 347 U.S. 522, 530, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954). The formulation of policies pertaining to the alien's right to remain here are entrusted exclusively to Congress, and in the enforcement of these policies the Executive Branch must respect the safeguards of due process. *Id.* at 531, 74 S.Ct. at 743

(citing *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49, 70 S.Ct. 445, 453–54, 94 L.Ed. 616 (1950); the *Japanese Immigrant case,* 189 U.S. 86, 91, 23 S.Ct. 611, 612, 47 L.Ed. 721 (1903)). Policy questions concerning the appropriate punishment to be applied for the commission of unreasonable searches and seizures do not come within the safeguards of the due process clause. Thus, these matters should be left to the political branches of government.

CONCLUSION

I would affirm the orders of the BIA on each of these matters. Each appellant failed to make a motion to suppress evidence of his oral statements at his hearing before the immigration judge. The failure to so object constituted a waiver of the right to seek appellate review.

Further, appellants failed to present any evidence which would support an inference that the drastic remedy of excluding relevant evidence of illegal status is required to curb widespread lawless enforcement of our immigration laws. In fact, the majority has forthrightly conceded that there is a "paucity" of widespread, fourth amendment violations in the arrests of aliens who have illegally entered this nation. The Supreme Court has refused to extend the exclusionary rule where there is insufficient evidence that it is required to curb repeated lawless enforcement of the law.

A strong internal deterrent to unreasonable searches and seizures has been devised by the Immigration and Naturalization Service. There is no sound reason for us to undertake the supervision of the conduct of arrests and searches and seizures by immigration officers. This nation cannot afford the added cost to the enforcement of our immigration laws that will surely follow implementation of the majority's new rule of evidence. We should demand a showing of strong justification for the erection of new barriers to effective enforcement of our immigration laws. As the Supreme Court recently observed:

> at the least, those who elect to enter our territory by stealth and in violation of our law should be prepared to bear the consequences, including but not limited to, deportation.

*Plyler v. Doe,* 457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982).

As members of the judicial branch of government whose constitutional role is limited to the application of existing law to real cases or controversies, shouldn't we restrain ourselves from the temptation to legislate extreme remedies to correct non-existent problems?

EUGENE A. WRIGHT, Circuit Judge, specially concurring in the dissenting opinion:

Three factors must be weighed before deciding whether to apply the exclusionary rule: the deterrent impact it might have, the societal costs of applying it, and the need for deterrence in the particular setting.

### A. *Deterrent Impact*

The Court has evaluated the rule's deterrent impact in light of its "assumptions of human nature and the interrelationship of the various components of the law enforcement system." *United States v. Janis,* 428 U.S. 433, 459, 96 S.Ct. 3021, 3034, 49 L.Ed.2d 1046 (1976).

In *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), it held that a grand jury witness could not refuse to answer questions because they were based on information obtained in violation of his Fourth Amendment rights. Because the evidence would be suppressed in a subsequent criminal proceeding, application of the rule "would deter only police investigation consciously directed toward the discovery of evidence solely for use in a grand jury investigation." *Id.* at 351, 94 S.Ct. at 621.

In *Janis,* the Court held that evidence seized by a state law enforcement officer in good faith, but nevertheless in violation of the Fourth Amendment, was admissible in a civil proceeding by or against the United States.

*Calandra* and *Janis* are based on the assumption that the more likely an officer is

to gather evidence for use in a specific forum, the greater the deterrent impact from suppressing evidence in that forum. Our decisions reflect this approach.

We have held that the exclusionary rule is inapplicable in probation revocation and subsequent sentencing proceedings where the officer was unaware of the probationer's status. *United States v. Vandemark,* 522 F.2d 1019 (9th Cir.1975). But we applied the rule in a sentencing hearing where the officers had a personal stake in seeing that a violator was convicted and given a long sentence. *Verdugo v. United States,* 402 F.2d 599, 611–13 (9th Cir.1968), *cert. denied,* 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1970); *see United States v. Winsett,* 518 F.2d 51, 54 n. 5 (9th Cir.1975).

This suggests there would be a deterrent effect if the rule were applied in deportation proceedings because these proceedings are within immigration officers' zone of primary interest. *Matter of Sandoval,* 17 I & N Dec. 70, 78 (BIA 1979).

In many cases, however, the aliens uncovered through unlawful investigations will be deportable on the basis of evidence in the INS files. The government's burden, in many deportation proceedings, is solely to establish the identity and alienage of the respondent, who has the burden to show time, place, and manner of entry. 8 U.S.C. § 1361. Since "identity" is not subject to suppression, *see, e.g., Wong Chung Che v. INS,* 565 F.2d 166, 168 (1st Cir.1977), the government could carry its burden, even if unlawfully obtained evidence were suppressed, if it had evidence of alienage in its file. This factor significantly reduces the rule's deterrent impact.

### B. *Societal Costs*

Application of the exclusionary rule may impose significant societal costs. In a deportation proceeding, these costs might include: diverting attention from the "main issues" in deportation proceedings, overburdening immigration judges, and permitting unlawful aliens to remain in the United States, in effect "sanctioning . . . a continuing violation of this country's immigration laws." *Matter of Sandoval,* 17 I & N Dec. at 80–81.

If I were persuaded the exclusionary rule would have a significant deterrent impact and that there was a need for deterrence in this setting, societal costs would not cause me to reject its application. They are less onerous than the societal costs imposed by the rule in criminal trials.

When compared with only a minimal deterrent impact, however, these costs raise a serious question whether the exclusionary rule should be applied here. The societal interest in the efficient enforcement of immigration laws may outweigh the potential incremental safeguarding of Fourth Amendment rights.

### C. *Need for Deterrence*

The third factor to be considered is the need for deterrence. The primary consideration here is the function performed by the officers sought to be deterred.

The need for deterrence is greatest when we are concerned with the conduct of officers who are armed and have broad and discretionary authority to investigate the commission of crimes and apprehend suspects. The potential for abuse of that authority poses such a substantial threat to the rights guaranteed by the Fourth Amendment that it justifies the extreme remedy of the exclusionary rule.

At the other end of the spectrum, officers with limited powers to investigate compliance with civil, regulatory measures pose a less immediate threat to constitutional rights. Accordingly, the need for the extreme sanction of the exclusionary rule is less compelling. *Cf. Todd Shipyards Corp. v. Secretary of Labor,* 586 F.2d 683, 689 (9th Cir.1978) (suggesting exclusionary rule not applicable in OSHA proceedings); *NLRB v. South Bay Daily Breeze,* 415 F.2d 360, 364 (9th Cir.1969), *cert. denied,* 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970) (suggesting rule only applicable to criminal or quasi-criminal proceedings).

Immigration and border patrol agents fall somewhere between these two extremes. On one hand, they do enforce criminal laws, they can be armed, and they have

broad powers to investigate and arrest persons. When acting as criminal law enforcement agents, they pose a potential threat to Fourth Amendment rights comparable to that posed by other armed police officers.

These agents, however, are also charged with enforcing civil immigration laws. In both of these cases agents were trying to determine whether individuals were deportable aliens. They did not use weapons or threaten violence. They were not seeking to apprehend criminals.

These are not cases in which the manner of seizing evidence was so egregious as to call for the deterrent impact of the rule. *See Ex Parte Jackson,* 263 F. 110 (D.Mont. 1920); *Ramira-Cordova,* A21 095 & 660 (BIA Feb. 21, 1980). In *Ramira-Cordova,* four or five armed agents pounded on the respondents' door at 4:00 A.M. Upon entering, the agents, without warrant, probable cause, or founded suspicion, questioned the occupants, threatened one with violence, pushed another aside, and searched the entire apartment.

In *Jackson,* deportation proceedings were brought against a resident alien who belonged to a controversial labor organization. Seeking to put an end to its activities, federal agents and soldiers "perpetrated a reign of terror, violence, and crime against citizen and alien alike." 263 F. at 112. Under the circumstances, the need for the deterrent impact of the exclusionary rule was overwhelming. The court declared that, even if the alien was a "Red,"

> he and his kind are less a danger to America than those who indorse or use the methods that brought him to deportation. These latter are the mob and the spirit of violence and intolerance incarnate, the most alarming manifestation in America today.

*Id.* at 113.

The conduct of the agents in these cases simply is not comparable to the conduct of the agents in *Ramira-Cordova* or in *Jackson.* In this setting, the function performed by the agents is fairly analogized to the function performed by officers enforcing civil, regulatory measures. As such, the

need for deterrence is less than in a case involving criminal law enforcement, or the use or threat of violence.

#### D. *Conclusion*

Considering all three factors, I conclude the exclusionary rule should not be applied here. I would hold that where the exclusionary rule would have a minimal deterrent impact, the officers involved were enforcing civil laws in a peaceful manner, and the rule would impose significant societal costs, it should not be applied.

POOLE, Circuit Judge, dissenting:

I join in Judge Alarcon's dissenting opinion and have added my separate thoughts.

The majority's extension of the exclusionary rule to the suppression of oral statements in civil deportation proceedings is particularly inapposite in light of the recent Supreme Court holding in *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In the context of a *criminal* prosecution, the plurality opinion of Justice White stated in *Royer:*

> * * * [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. *See Dunaway v. New York,* 442 U.S. 200, 210 n. 12 [99 S.Ct. 2248, 2255 n. 12, 60 L.Ed.2d 824] (1979); *Terry v. Ohio,* 392 U.S. 1, 31, 32–33, 88 S.Ct. 1868, 1885–86, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring); *id.,* at 34, 88 S.Ct. at 1886 (White, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objection justification *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). The person approached, however, need not answer any question put to him; indeed he may decline to

listen to the questions at all and may go on his way. *Terry v. Ohio, supra,* at 32–33, 88 S.Ct. at 1885–86 (Harlan, J., concurring); *id.,* at 34, 88 S.Ct. at 1886 (White, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. *United States v. Mendenhall, supra,* 446 U.S. at 556, 100 S.Ct. at 1878 (opinion of Stewart, J.). * * *

*Id.* 103 S.Ct. at 1324.

The agents in this case did not violate the Fourth Amendment "by merely approaching" the suspected aliens and "by putting questions" to them, first in English and then in Spanish. When the subjects answered and conceded alienage and also illegal entry, the agents were justified in detaining them for they had probable cause to believe them to be in this country illegally. The subsequent reduction of this information to writing as a result of more questioning at the place of detention, added nothing new to the information which the agents had already legally obtained.

The majority makes much of its conclusion that Officer Bower had "no specific recollection" of Sandoval and could not pinpoint the specific conduct which attracted their attention. Eventually the majority concludes that all the observations of the agents, focused or unfocused, were simply patently insufficient to justify even a brief *Terry* stop of Sandoval. This to me appears too cozy. The record as a whole shows that all of the persons to whom questions were addressed first in English and then in Spanish had exhibited some behavior which preceded the questioning. Sandoval was among those asked in Spanish whether "they had papers." He had none. Of the group subsequently transported to the station, some immediately accepted voluntary deportation. Sandoval and Lopez declined. Sandoval willingly answered the questions which are contained in the I–213 form.

In Lopez's case, there was no response to the agent's questions in English made at the transmission shop where he worked.

Agent Eddy testified that he questioned Lopez; asked him his name, where he was from, how he entered the United States, about his family ties, "equities" in the United States and from those responses determined that Lopez was in the country illegally. This information was subsequently incorporated in the I–213 form.

If, as the majority states, the connection of Lopez and Sandoval to the attention-attracting conduct observed by the agents is not set forth with sufficient explicitness or detail, the remedy for that omission would be for the court to say that the record lacked that requisite explicitness. In such case there could be proper remand to determine whether indeed these two individuals had been so engaged. Instead, the majority leaps to the adoption of a sweeping exclusionary rule because that is what the majority was all about from the start.

None of the information was ever used against either appellant in any criminal case. The majority ignores this fact. It first treats the case as one of illegal arrest, and then, invoking the authority of criminal cases, pronounces of the unavailability in a deportation hearing statements which were voluntarily made.

The majority has reached out to exclude from a civil deportation proceeding evidence which would otherwise have been admissible. The majority believes that deportation proceedings are not really "civil" as we know that term but ought to be classified on the same level as those which are denominated "criminal." While these two cases furnish a shaky vehicle for the journey from civil to criminal, the majority has had little difficulty convincing its members that the time has come to change the rules on immigration. Even if that were to be the conclusion from a record of documented injustices, no such record exists here. Hence, I dissent.